SHELTER FRAMING CORPORATION, Plaintiff/Appellee,

and

Carpenters Pension Trust for Southern California, Defendant/Appellee,

v.

PENSION BENEFIT GUARANTY CORPORATION, Applicant for Intervention/Appellant.

G & R ROOFING COMPANY, a California corporation, Plaintiff/Appellee,

and

Carpenters Pension Trust for Southern California, Defendant/Appellee,

v.

PENSION BENEFIT GUARANTY CORPORATION, Applicant for Intervention/Appellant.

SHELTER FRAMING CORPORATION, Plaintiff/Appellee,

v.

CARPENTERS PENSION TRUST FOR SOUTHERN CALIFORNIA, Defendant/Appellant.

G & R ROOFING COMPANY, Plaintiff/Appellee,

v.

CARPENTERS PENSION TRUST FOR SOUTHERN CALIFORNIA, Defendant/Appellant.

G & R ROOFING COMPANY, Plaintiff/Appellant,

v.

CARPENTERS PENSION TRUST FOR SOUTHERN CALIFORNIA, Defendant/Appellee.

R.A. GRAY AND CO., Plaintiff/Appellant,

v.

OREGON–WASHINGTON CARPENTERS–EMPLOYERS PENSION TRUST FUND and Pension Benefit Guaranty Corporation, Defendants/Appellees.

Nos. 82–5271, 82–5272, 82–5460 to
82–5462 and 82–3506.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 7, 1982.

Decided May 20, 1983.

**1504**

Howard A. Kroll, James P. Watson, George M. Cox, Cox, Castle & Nicholson, Los Angeles, Cal., for Carpenters Pension Trust for Southern California.

Michael E. Merrill, Merrill & Schultz, San Diego, Cal., for G & R Roofing Co.

Cathryn M. Brogan, Peter Szabadi, Ronald J. Seeley, Acret & Perrochet, Los Angeles, Cal., for Shelter Framing Corp.

David S. Paull, Bailey & Paull, Portland, Or., William B. Crow, Miller, Nash, Yerke, Wiener, Portland, Or., for Oregon-Washington Carpenters Employees Pension Trust Fund & Pension Benefit.

Henry Rose, Gen. Counsel, Baruch Fellner, J. Stephen Caflisch, David F. Power, Terence G. Craig, Pension Benefit Guaranty Co., Washington, D.C., amicus curiae for Pension Benefit Guaranty Corp.

Thomas M. Triplett, Mildred J. Carmack, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., for R.A. Gray & Co.

Harris Weinstein, Covington & Burling, Washington, D.C., amicus curiae for Transport Motor Exp. E.W. Bohren, Transport & Essex Corp.

Before WRIGHT, KENNEDY and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

This opinion addresses the constitutionality of the retroactive application of the Multiemployer Pension Plan Amendments Act (the "Amendments Act"),[1] the subject of extensive nationwide litigation.[2] We hold

---

1. Pub.L. No. 96–364, 94 Stat. 1208 (1980) (codified at 29 U.S.C. §§ 1001a *et seq.* (Supp. V 1981).

2. The following is a partial list of related cases: *Sibley, Lindsay & Curr, Co. v. Bakery, Confectionery & Tobacco Workers Int'l Union,* No. Civ. 82–555T (W.D.N.Y. Mar. 16, 1983); *Washington Star Co. v. Int'l Typographical Union Nego. Pension Plan,* Civ. No. 82–1568 (D.D.C. Feb. 9, 1983) (mem.); *Bakersfield Concrete Constr., Inc. v. Construction Laborers Pension Trust,* No. 82–0044–WPG (C.D.Cal. Jan. 10, 1983); *Republic Indus. v. Teamsters Joint Council No. 83 of Va. Pension Fund,* Civ. No. 82–0919–A (E.D.Va. Dec. 29, 1982) (mem.); *Republic Indus., Inc. v. Central Pa. Teamsters Pension Fund,* 693 F.2d 290 (3d Cir.1982); *Grano Steel Corp. v. Shopmen's Ironworkers Pension Plan,* No. CV 81–5862 LEW (C.D.Cal. Nov. 9, 1982); *Textile Workers' Pension Fund v. Standard Dye & Finishing Co.,* 3 Empl.Ben.Cas. 2129 (S.D.N.Y.1982); *Pacific Iron & Metal Co. v. Western Conf. of Teamsters Pension Trust Fund,* 553 F.Supp. 523 (W.D.Wash.1982); *Coronet Dodge v. Speckmann,* 553 F.Supp. 518 (E.D.Mo. Sept. 30, 1982) (mem.); *Fur Mfg. Indus. Retirement Fund v. Lazar-Wisotzky, Inc.,* 550 F.Supp. 35 (S.D.N.Y.1982); *Victor Constr. Co. v. Construction Laborers Pension Trust,* No. 81–5144–CHH (C.D.Cal. June 25, 1982); *Terson Co. v. Pension Benefit Guar. Corp.,* 3 Empl.Ben.Cas. 2372 (N.D.Ill.1982), (dismissed as moot, unpublished order); *Peick v. Pension Benefit Guar. Corp.,* 539 F.Supp. 1025 (N.D.Ill. 1982); *S & M Paving, Inc. v. Construction Laborers Pension Trust,* 539 F.Supp. 867 (C.D. Cal.1982).

that retroactive application of the withdrawal liability provision of the Amendments Act violates the due process rights of employers who withdrew from multiemployer pension plans before the Act became law.[3]

## I. BACKGROUND

On September 26, 1980, the President signed into law the Amendments Act, amending certain provisions of the Employee Retirement Income Security Act ("ERISA").[4] Under ERISA, the Pension Benefit Guaranty Corporation (the "Guaranty Corporation"), a government corporation, administers a system of termination insurance designed to protect employees whose pension plans fail or terminate with insufficient funds. The Guaranty Corporation receives no direct federal appropriations, but relies primarily on premium payments to meet its obligations to employees whose guaranteed benefits exceed the value of their plans' assets when the plans terminate. 29 U.S.C. § 1307 (Supp. V 1981).

When the Guaranty Corporation expended its own funds, it was formerly authorized by Title IV of ERISA to impose secondary liability on employers. Employers who withdrew from multiemployer plans incurred a contingent liability. If a plan terminated, all employers who contributed to that plan during the five years immediately preceding its termination were collectively liable to the Guaranty Corporation for the amount the Guaranty Corporation expended. If termination liability arose, however, no single employer's liability could exceed thirty percent of that employer's net worth. *Id.* at §§ 1362(b)(2), 1364 (1976).

The Guaranty Corporation advised Congress that the contingent liability provisions of ERISA gave employers an incentive to withdraw from multiemployer plans, particularly when their plans were in poor financial health. Congress responded by enacting the Amendments Act, which replaced contingent liability with absolute liability upon withdrawal. Under the Amendments Act, an employer who withdraws must immediately begin to pay a fixed and certain debt owned to the pension plan. The withdrawal liability is the employer's proportionate share of the plan's unfunded vested liability, the difference between the present value of vested benefits and the value of the plan's assets. The withdrawal liability provision was assigned a retroactive effective date of April 29, 1980. *Id.* at § 1461(e)(2)(A) (Supp. V 1981).

## II. FACTS

There are no disputed issues of material fact. A 1959 trust agreement between the United Brotherhood of Carpenters and Joiners of America ("the Union") and several multiemployer associations formed the Carpenters Pension Trust for Southern California, a multiemployer pension plan which primarily covers employees in the building and construction industry. The Trust assets are managed by a board of trustees. Half of the trustees are appointed by the Union; the other half are appointed by the multiemployer associations.

Shelter Framing Corporation is a licensed construction contractor in southern California. Prior to July 1, 1980, Shelter Framing

---

**3.** Several appeals are consolidated for disposition by this opinion. In nos. 82–5271 and 82–5272, the Pension Benefit Guaranty Corp. appeals the district court's denial of its motion to intervene in the suit brought by Shelter Framing Corp. and G & R Roofing Co. against Carpenters Pension Trust.

Nos. 82–5460 and 82–5461 are the appeals brought by Carpenters Pension Trust from the district court's grant of summary judgment in favor of plaintiffs Shelter Framing and G & R Roofing.

No. 82–5462 is the cross-appeal brought by G & R Roofing Co. challenging, *inter alia,* the district court's refusal to declare the Multiem-

ployer Pension Plan Amendments Act unconstitutional as a taking of property without just compensation.

All of the above appeals are from the judgments of Hon. Irving Hill, C.D. California.

In No. 82–3506, R.A. Gray & Co. appeals from the grant of summary judgment by Hon. James A. Redden, D. Oregon, in favor of defendants Oregon-Washington Carpenters-Employers Pension Trust Fund and the Pension Benefit Guaranty Corp.

**4.** Pub.L. No. 93–406, 88 Stat. 829 (1974) (codified at 29 U.S.C. §§ 1001–1461 (1976).

was bound by a collective bargaining agreement with the Union. The agreement obligated Shelter Framing to contribute to the trust fund for each hour worked by covered carpentry employees.

That agreement terminated on July 1, 1980. Shelter Framing and the Union attempted to reach a new agreement but failed. When their negotiations reached an impasse, Shelter Framing was no longer required to make any contributions to the trust fund on behalf of its employees. It ceased making payments on August 12, 1980.

On April 24, 1981, the trustees notified Shelter Framing that it had withdrawn from the trust within the meaning of the Amendments Act,. and Shelter Framing thus owed to the trust fund withdrawal liability of $797,648.00. Shelter Framing had the option of paying the liability claim in a lump sum within 60 days, or in 40 monthly installments which, after interest, totalled $899,751.88. Shelter Framing admitted it withdrew from the trust, but refused to make any payments on the liability claim. The joint statement of stipulated facts indicates that for the period ending March 31, 1981, the withdrawal liability equals about 180 percent of the total stockholder equity in the corporation.[5]

G & R Roofing Company is a construction contractor, obligated under a collective bargaining agreement to make contributions to the Carpenters Pension Trust for each hour of covered work performed by carpentry employees. The agreement expired July 1, 1980, and the parties failed to reach a new agreement. The last pension contribution G & R made to the trust fund was for work performed through August 12, 1980. On September 2, 1981, the trustees assessed withdrawal liability against G & R for $687,387.00. G & R could pay a lump sum of that amount, or pay a total of $784,-824.88 in 45 monthly payments. The stipulated facts indicate that for the fiscal year ending September 30, 1981, the withdrawal liability equals about forty percent of the total stockholder equity in the company.[6]

On August 28, 1981, Shelter Framing filed suit against the trust, seeking to enjoin the collection of withdrawal liability on constitutional grounds. G & R filed a similar complaint against the trust on October 27, 1981. The trustees answered and counterclaimed for collection of the assessed withdrawal liability in both cases, which were consolidated before Senior District Judge Irving Hill.

On October 2, 1981, the trust's co-counsel informed the appellant Guaranty Corporation of the pending suit. The Guaranty Corporation is authorized to intervene in civil actions brought under the withdrawal liability provisions of ERISA. 29 U.S.C. § 1451(g) (Supp. V 1981). The Guaranty Corporation declined the trustees' invitation to intervene, though it said it would monitor the case. G & R sent a Notice of Service of Complaint in its action to the Guaranty Corporation on October 30, 1981.

In November, G & R and Shelter Framing filed motions for preliminary injunctions against attempts by the trustees to collect the withdrawal liability. The Guaranty Corporation learned from a G & R attorney in early November that the motions would be heard on December 7, 1981. The motion hearing was continued until January 11, 1982.

Judge Hill granted the plaintiffs' motions to enjoin further efforts by the trustees to collect withdrawal liability. On January 14, 1982, at a hearing held to set the terms of the preliminary injunctions, Judge Hill said he would enjoin the parties from arbitrating the disputed amount of withdrawal liability. The order was entered on January

---

**5.** In its brief on appeal, Shelter Framing states that the withdrawal liability now exceeds twice the net worth of the corporation and that immediate payment of the total claim is financially impossible, as it would require the complete termination of operations and sale of the corporate assets.

**6.** In its brief on appeal, G & R reiterates that if paid in a lump sum, the withdrawal liability totals forty percent of the company's net worth. If paid on a monthly basis, the annual liability would represent ninety-four percent of G & R's net income for its fiscal year 1981.

20, 1982. The parties then filed cross-motions for summary judgment, accompanied by a joint statement of stipulated facts.

The Guaranty Corporation moved to intervene in the case on February 22, 1982. It sought to dissolve the injunction against arbitration between the employers and the trustees. The district court held that the Guaranty Corporation could not move for partial dissolution of the preliminary injunctions unless and until it was a party to each action, but agreed to hear the question of exhaustion of arbitration on March 22, 1982, before the hearing on the motions for summary judgment. The court denied the Guaranty Corporation's motion to intervene as untimely, and stated the parties would be prejudiced if the Guaranty Corporation were given leave to intervene. It did allow the Guaranty Corporation to participate as *amicus curiae.*

After hearing arguments, Judge Hill held that exhaustion of the administrative remedy of arbitration was not required before proceeding to the merits of the constitutional challenges, because the arbitrators could not adjudicate or develop a better record for adjudication of the constitutional claims. On cross-motions for summary judgment, the court held that the Amendments Act was unconstitutional as applied to Shelter Framing and G & R. Judgments were entered in favor of plaintiffs on April 13, 1982. The court also awarded attorney's fees to plaintiffs.[7]

After entry of judgment, the parties entered into a stipulation to allow the Guaranty Corporation to intervene for purposes of appeal. The Guaranty Corporation chose not to intervene, and the court denied the intervention on the ground that it lacked jurisdiction to reverse by stipulation its prior order denying intervention. The Guaranty Corporation appeals the district court's prior denial of the motion to intervene at trial and also seeks to appeal the court's failure to require arbitration before ruling on the constitutional claims.

R.A. Gray & Co. is an employer who was obligated under a collective bargaining agreement with the Oregon State Council of Carpenters to contribute to the Oregon-Washington Carpenters-Employers Pension Trust Fund. The parties did not renew the agreement when it expired on May 31, 1980. On July 24, 1981, the trustees notified R.A. Gray that it had withdrawn from the multiemployer plan as of June 1, 1980 and assessed withdrawal liability in the amount of $201,359.00.

R.A. Gray sued for declaratory and injunctive relief in September 1981, challenging the constitutionality of the Amendments Act on grounds similar to those considered in Judge Hill's court. Judge Redden denied R.A. Gray's request for a preliminary injunction, and granted summary judgment for the trust.

## III. THRESHOLD ISSUES

Before we reach the issue of the constitutionality of the retroactive application of the Amendments Act, we must consider two threshold issues raised by the Guaranty Corporation in appeal numbers 82–5271 and 82–5272. The first is whether the district court abused its discretion in denying the Guaranty Corporation's motion to intervene. The second is whether parties challenging the constitutionality of the Amendments Act must exhaust the administrative remedy of arbitration before adjudication of the constitutional claims.

### A. INTERVENTION

■ Federal Rule of Civil Procedure 24(a) allows intervention as of right upon timely application when a federal statute confers an unconditional right to intervene, or when the applicant claims an interest relating to the subject of the action and disposition may impair or impede its ability to protect that interest. A district court's ruling that an intervention motion is untimely will not be overturned unless the court abused its discretion. *Petrol Stops Northwest v. Continental Oil Co.,* 647 F.2d 1005, 1009 (9th Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 672, 70 L.Ed.2d 639 (1981).

7. Judge Hill's opinion is reported at 543 F.Supp. 1234 (C.D.Cal.1982).

██ The district court did not abuse its discretion in denying the Guaranty Corporation's motion. The court stated that the motion was untimely and that the Guaranty Corporation had forfeited its right of intervention by permitting the matter to progress as far as it had without attempting to intervene.

██ We weigh three factors to determine timeliness: the stage of the proceedings at which an applicant seeks to intervene, the reason for and length of the delay, and whether the parties would suffer prejudice. *Alaniz v. Tillie Lewis Foods,* 572 F.2d 657, 659 (9th Cir.) (per curiam), *cert. denied,* 439 U.S. 837, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). Our focus is on the date the Guaranty Corporation should have been aware its interest would not be protected adequately by the parties, not the date it learned of the litigation. *See id.; Legal Aid Society of Alameda Co. v. Dunlop,* 618 F.2d 48, 50 (9th Cir.1980) (per curiam).

The Guaranty Corporation argues that it does not have the staff to intervene in all actions challenging the constitutionality of the Amendments Act (now over 100 nationwide) and must monitor cases until it decides intervention is required to protect its interests. In the cases here on appeal, it claims that it was not aware until mid- to late January that the Carpenters Pension Trust would not take the position favored by the Guaranty Corporation, requiring arbitration as an administrative remedy before adjudication of the constitutional claims. It "suspected" that its interests might not adequately be represented on January 15, 1982, when it learned that the trust's counsel did not oppose an injunction against arbitration. The suspicion "turned to alarm" when the Guaranty Corporation received a copy of the court's injunction on January 25, 1982.

We are not convinced by the Guaranty Corporation's claim that it did not suspect that the trust would not protect the Guaranty Corporation's interests until late January. The Guaranty Corporation knew in early November that preliminary injunction motions had been filed. It never inquired

what position the trust or other parties would take on the arbitration issue. The trust never indicated to the Guaranty Corporation it would ask for arbitration; in fact, the trust's counsel stated "no one could have had a reasonable basis for assuming" that the trust would seek arbitration.

In *Alaniz,* appellants sought intervention seventeen days after a consent decree became effective. They argued that they did not know the settlement decree would be to their detriment. The court affirmed denial of their motion, stating "surely they knew the risks. To protect their interests, appellants should have joined the negotiations before the suit was settled." 572 F.2d at 659. The Guaranty Corporation even more clearly knew the risks in these cases. Had it monitored the cases, as it told the trust it would, it could not reasonably have assumed that the trust would demand arbitration.

Even if the Guaranty Corporation is not held to have known the risks, and did not learn its interests were jeopardized until January 15, it still fails the timeliness test. It did not move to intervene until February 22, more than one month after its original "suspicion" arose. *See NAACP v. New York,* 413 U.S. 345, 367, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973) (delay of two and one-half weeks was untimely where motion papers indicated a strong likelihood that the parties would enter into a consent decree). Since prompt adjudication of the employers' claims was in the litigants' interest, they would be prejudiced by permitting this inexcusably late intervention motion.

Finally, the district court allowed the Guaranty Corporation to argue as *amicus curiae* on the issue of arbitration, thus the Guaranty Corporation had fair opportunity to present its views to the court. In view of that opportunity, and the Guaranty Corporation's untimely action, we hold that the district court did not abuse its discretion.

## B. ARBITRATION

The Guaranty Corporation argues that the district court lacked jurisdiction and, in

any event, should not have addressed the constitutional issues before requiring arbitration because arbitration of withdrawal liability is statutorily mandated and, if not mandatory, should be required as a matter of policy. In view of our decision that the district court did not err in denying the Guaranty Corporation's motion to intervene, the Corporation has no standing to raise the arbitration issue. Nevertheless, we must reach that issue at least to determine whether arbitration of withdrawal liability was mandated, before the district court could address the constitutionality of the withdrawal provisions.

Section 4221(a)(1) of ERISA does provide for resolution of disputes through arbitration proceedings. 29 U.S.C. § 1401(a)(1) (Supp. V 1981). The statute is limited, however, to those disputes involving a determination made under sections 4201 through 4219 of ERISA. Those sections refer to the establishment, computation and collection of withdrawal liability. 29 U.S.C. at §§ 1381–1399 (Supp. V 1981). Thus the arbitration requirement does not apply where the constitutionality of the statute, not the establishment or amount of withdrawal liability, is at issue. The district court correctly found no mandatory arbitration requirement for determination of constitutional issues.

Where there is no statutory requirement of exhaustion, the court should balance the agency's interests in applying its expertise, making a proper record, and maintaining an efficient, independent administrative system with the interests of private parties in finding adequate redress. *Montgomery v. Rumsfeld,* 572 F.2d 250, 253 (9th Cir.1978). We recognize the importance of the exhaustion doctrine and its underlying policy of judicial efficiency. *See Myers v. Bethlehem Shipbuilding Corp.,* 303

U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). Upon weighing the relevant factors, however, we conclude that arbitration in this case would be of no value to the parties or the court. The Guaranty Corporation's expertise relates only to how the Amendments Act is to be applied and administered; it cannot aid the court in addressing the naked constitutional law issue raised by the employers in their direct attack upon the entire statutory scheme. Arbitration would not eliminate the assessed withdrawal liability. There is only a remote possibility that liability would be reduced materially. Arbitration would neither develop a better record for adjudication of the constitutional issues nor eliminate the need to consider the constitutional challenge.

Our conclusion is consistent with the decisions of other courts that have already considered the adequacy of arbitration as an administrative remedy in the face of a constitutional attack on the Amendments Act. *See Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund,* 693 F.2d 290 (3d Cir.1982) (it would be futile to compel exhaustion where plaintiff mounted a facial challenge to the Amendments Act); *Peick v. Pension Benefit Guaranty Corp.,* 539 F.Supp. 1025, 1038 & n. 27 (N.D.Ill.1982) (where plaintiffs brought a facial challenge to the statute, the lack of a factual record and the possibility of an exemption did not bar action on ripeness grounds).[8]

## IV. RETROACTIVITY

Having concluded that the district court had jurisdiction to consider the constitutional challenge to the Amendments Act, we now turn to the issue of whether retroactive application of the Act violates due process. We have reviewed opinions on both sides of the issue.[9] We recognize that

---

**8.** We agree with the court in *Republic* that where the exhaustion doctrine is inapplicable, we need not consider the trust's argument that this case falls within one of the exceptions to the exhaustion doctrine. 693 F.2d at 298.

**9.** In addition to the well-reasoned opinions of Judges Hill and Redden, a thorough discussion

of the issue may be found in *Peick v. Pension Benefit Guar. Corp.,* 539 F.Supp. 1025 (N.D.Ill. 1982). Judge Getzendanner concludes in *Peick* that although "this is an extremely close call", *id.* at 1056, retroactive application of the Amendments Act is constitutional. *But see Sibley, Lindsay & Curr, Co. v. Bakery, Confectionery and Tobacco Workers Int'l Union,* No.

the Amendments Act comes to the courts with a presumption of constitutionality and that the burden is on the plaintiffs to establish that Congress acted in an arbitrary and irrational way. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). We also recognize that "[t]he due process clause does not make unconstitutional every law with retroactive effect" and that "[o]nly when such retroactive effects are so wholly unexpected and disruptive that harsh and oppressive consequences follow is the constitutional limitation exceeded." *Hazelwood Chronic & Convalescent Hospitals, Inc. v. Weinberger,* 543 F.2d 703, 708 (9th Cir.1976), *vacated on other grounds,* 430 U.S. 952, 97 S.Ct. 1595, 51 L.Ed.2d 801 (1977). We find, however, that the retroactive burden imposed by the Act on plaintiffs-employers is constitutionally invalid.

An analysis of the retroactivity issue must begin with a review of congressional goals in enacting the Amendments Act and a brief legislative history of the Act.[10] As enacted in 1974, ERISA provided that before January 1, 1978, payment of guaranteed benefits earned by employees in multiemployer plans was made at the discretion of the Guaranty Corporation. 29 U.S.C. § 1381(c) (1976). On January 1, 1978, payment of guaranteed benefits for terminated multiemployer plans was to become mandatory. In 1977, Congress expressed concern about the effect, particularly the cost, of implementing the mandatory guarantee. It therefore delayed the effective date of the mandatory guarantee program and ordered the Guaranty Corporation to submit a report on multiemployer plans. *See Peick v. Pension Benefit Guaranty Corp.,* 539 F.Supp. 1025, 1030–31 (N.D.Ill.1982). Over the course of the next few years, while Congress debated the issue of multiemployer plan termination, the effective date of the mandatory guarantee program was extended three more times in anticipation of legislative changes in ERISA's multiemployer plan provisions. *Id.* at 1032–33.

Civ. 82–555T (W.D.N.Y. Mar. 16, 1983), in which the court held that retroactive application of the Act is unconstitutional.

The Guaranty Corporation's study, submitted to Congress on July 1, 1978, reported that ERISA might encourage termination of multiemployer pension plans. The Corporation suggested that since mandatory termination insurance would protect virtually all vested benefits in multiemployer plans, employers, whose liability was contingent and limited to thirty percent of their net worth, might choose to terminate their plans. Active employees might also desire termination where a high proportion of pension contributions was being used for retirees' benefits. The Guaranty Corporation feared that these combined economic advantages might act as an incentive to plan termination. *Id.* at 1031–32 (quoting Pension Benefit Guaranty Corporation, Multiemployer Study Required by P.L. 95–214, at 23–24 (1978)). On February 27, 1979, the Corporation submitted a legislative proposal advocating certain changes in ERISA designed to diminish that incentive. Legislation was formally introduced on May 3, 1979.

The 1979 legislative proposal eventually became the Amendments Act. When the bill was first introduced, the withdrawal liability rules were given an effective date of February 27, 1979, the date the proposal was first submitted by the Guaranty Corporation. In June 1980, the Senate Finance Committee determined that the February 27, 1979 date was unnecessarily harsh, and changed it to April 29, 1980, the date eventually enacted into law. *Id.* at 1053. The Act was finally signed into law on September 26, 1980.

In determining the validity of the retroactive provision, Judge Hill and Judge Redden followed the analysis used by the Seventh Circuit in *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 592 F.2d 947 (7th Cir.1979), *aff'd,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354, *reh'g denied,* 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1137 (1980). The

10. For an extensive discussion of the legislative history of the Amendments Act, *see Peick,* 539 F.2d at 1029–34.

issue presented in *Nachman* was whether the retrospective imposition of employer liability authorized by ERISA superseded a liability exclusion clause included in the single employer's pension plan. The court examined four factors for the purpose of determining whether the employer was subject to liability. The factors were: (1) the reliance interests of the parties affected; (2) whether impairment of the private interest is effected in an area previously subjected to regulatory control; (3) the equities of imposing the legislative burdens; and (4) the inclusion of statutory provisions designed to limit and moderate the impact of the burdens. 592 F.2d at 960. Applying that test the *Nachman* court held that the employer was liable. Although the case did not involve a retroactive effective date, we agree that the *Nachman* test applies here, and we shall discuss each of the factors as applied to the retroactive imposition of the withdrawal liability required by the Amendments Act.

## A. RELIANCE INTERESTS

This factor weighs in favor of Shelter Framing, G & R, and R.A. Gray ("the employers"). They all withdrew from their multiemployer plans before the date the Amendments Act was enacted. It was not certain at the time they withdrew that the Amendments Act would be enacted and would have a retroactive effect. We reject the argument that the employers should have known of the status of the pending legislation and should have known that the Act, when passed, would have a retroactive effect. *See Peick,* 539 F.Supp. at 1053. This much-debated legislation went through a variety of forms before its passage. The bill's original effective date was changed as late as June 1980. Congress also extended the effective date of the mandatory guarantee program four times while waiting for the Amendments Act to pass. It would have been impossible for anyone to predict with accuracy the final outcome of the legislative process. The employers therefore relied reasonably upon their collective bargaining agreements with the Unions and the contingent withdrawal liability provisions of ERISA.

The law here operates to the severe detriment of the employers, and we believe their reliance on the prior law to be the most relevant reliance interest to be considered. Yet we recognize as well that *Nachman* suggests consideration should be given to the reliance interests of other parties.

Employees expecting benefits under their multiemployer plans have an interest in the financial health of their plans. Their interest, however, goes more toward the solvency of the multiemployer plan as a whole than toward the individual contributions of a single employer, and this does not necessarily translate into a justified reliance interest in any single employer's withdrawal liability. There is no reason to believe that employees significantly relied for the financial health of the multiemployer plans on the increased termination liability imposed by the Amendments Act on those employers who withdrew between the effective date of the Act and the date of enactment. For example, the withdrawal liability imposed on the employers here is relatively insignificant in terms of the plans' total unfunded vested benefits liability. Judge Hill found that the employers' failure to pay their withdrawal liability caused Carpenters Pension Trust no clear or immediate harm. The trust fund and covered employees have not relied heavily on these employers' contributions, and thus their interests do not outweigh the reliance interests of the employers.

The *Nachman* court put greater emphasis on employee interest, but that case is different. *Nachman* involved a single employer pension plan, thus the employees had a far greater interest in the contributions of one employer. Furthermore, the employer in *Nachman* terminated after the enactment of ERISA. The employers in these cases, having withdrawn before enactment of the Amendments Act, were not given the opportunity to make such an educated choice. There were alternative actions the employers might have taken to avoid withdrawal liability had they known about their exposure to withdrawal liability under the

Amendments Act. For example, they might have renewed their collective bargaining agreements and continued to contribute to the plans. They might have gone out of business completely, or sold their assets to a company which participated in the plan. We conclude that the reliance factor weighs against the retroactive application of the statute.

## B. PRIOR REGULATION

This second factor, whether the interests impaired by the retroactive application of the Act were previously subject to regulation, is another facet of reliance. Where parties engage in a regulated business, they should reasonably anticipate some modification of the scope of regulation. In *Veix v. Sixth Ward Building & Loan Association,* 310 U.S. 32, 60 S.Ct. 792, 84 L.Ed. 1061 (1940), the Supreme Court emphasized the importance of prior state regulation in upholding a New Jersey law which was more restrictive than its predecessor. The plaintiff purchased shares in a savings and loan when state law allowed for a later turnback or redemption of those shares. After his purchase, the law was changed to restrict the conditions of redemption. The funds from which defendant was allowed to redeem shares were defined more narrowly, and early redeemers were given less priority on their turned-back shares. The Court stated:

> It was while statutory requirements were in effect that petitioner purchased his shares. When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic.

*Veix,* 310 U.S. at 38, 60 S.Ct. at 794 (footnote omitted).

Pension plans have, of course, been subject to regulation at least since the passage of ERISA in 1974. Subjecting parties to some risk of further regulation should not, however, require them to anticipate drastic legislative changes which extract a heavy fine for action taken before the changes win congressional approval. Parties can reasonably be expected to adjust their behavior in accordance with legislation which clarifies or modifies existing restrictions. In *Federal Housing Administration v. The Darlington, Inc.,* 358 U.S. 84, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958), the Supreme Court upheld an amendment to regulations regarding rental of property financed by federally insured loans. The Court said that in amending the law, Congress was articulating a construction of the law which it had already accepted under the original language. Thus the amendment was a clarification of, not a drastic change in, the existing law. In contrast, the retroactive application of the Amendments Act goes far beyond a clarification or modest modification of ERISA. The Act imposes a much heavier burden on withdrawing employers than had been imposed by ERISA. The fact of prior regulation in the pension plan area weighs in favor of retroactive application, but does not sway us from our conclusion that such application of the Act impaired the employers' reliance interests to an unduly harsh degree.

## C. EQUITIES

Here we confront the difficult task of weighing the individual burdens on the withdrawing employers against the policies Congress hoped to further by establishing a retroactive effective date for the Amendments Act. We approach our task sensitive to the historical development of judicial review of economic legislation.

The Supreme Court expressed its disfavor of retrospective legislation in *Railroad Retirement Board v. Alton Railroad,* 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935). At issue in *Alton* was a federal law requiring the railroads to establish a pension fund which would cover current employees and those who had worked for the railroad within the year before the law was adopted. The law also provided certain benefits to employees who left the railroad service and later returned. The Court held that the statute violated the due process clause, because it arbitrarily imposed additional liabilities on employers for transactions long

ago closed and fully compensated. 295 U.S. at 353–54, 55 S.Ct. at 764–765.

The reluctance of the Court in *Alton* to defer to legislative judgment is generally associated with the era of the Court's vigorous protection of economic interests on constitutional grounds. The decision, however, has never expressly been overruled. It was narrowed by the Court in *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). In that case, Congress passed a law providing benefits to coal mine workers who suffered from black lung disease. Amendments to the statute increased miners' benefits, which were paid in part by coal mine operators. The operators challenged the retrospective effect of the statute, arguing that it violated their due process rights because it required the operators to pay benefits to miners who had left their employ before the effective date of the act. The Court held the act valid as a rational means by which to spread the costs of mine workers' disabilities.[11]

*Turner Elkhorn Mining* suggested that the Supreme Court favors great deference to Congress' judgment in allocating economic benefits and burdens, even where legislative schemes impose significant hardships on some individuals. The more recent case of *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), restricts the degree of that deference. *Allied Structural Steel* involved a Minnesota law which provided protection to employees covered under private pension plans. Under plaintiff-employer's plan, certain employees did not have vested rights until they had worked fifteen years for the employer. Under the statute, employees needed only ten years of service to qualify as pension obligees. The Court held that the statute violated the contract clause because, *inter alia,* the law "worked a severe, permanent, and immediate change" in the contractual relationships, it worked unfairly against those who voluntarily had established pension plans, and it regulated a field not previously regulated by the state. 438 U.S. at 250, 98 S.Ct. at 2725.[12]

This case shares with *Alton* and *Allied Structural Steel* a harsh burden imposed upon the employers for completed transactions. The effective date of the Act was arbitrarily fixed. The employers are required now, after making the measured decision to withdraw from their plans, to pay a sum that seriously threatens their solvency, without a specific showing of proportionate need on the part of the pension trust funds.

This burden on the employers lacks the justification present in *Turner Elkhorn Mining.* There the Supreme Court found

> that the imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor—the operators and the coal consumers.

---

11. A similar result was reached by this court in *Todd Shipyards Corp. v. Witthuhn,* 596 F.2d 899 (9th Cir.1979). There the court held that a provision of the Longshoremen's and Harbor Workers' Compensation Act which allows for payment of death benefits if an employee who sustains permanent total disability due to injury thereafter dies from causes other than the injury applies to claims based upon a death which occurred after the effective date of the statute, even though the injury occurred before the effective date. The court rejected the argument that the statute violated due process, finding that the survivors' rights in death benefits first vested upon the employees' death, after the effective date of the statute. *Id.* at 902.

12. The Supreme Court has not expressly stated that the contract and due process clauses impose identical restraints on the legislative impairment of contracts. Considerations similar to those examined in contract clause analysis, however, may apply to the federal government through the due process clause. We have in the past confirmed the concurrent scope of the protection afforded by these provisions:

> [T]he Fifth Amendment's due process clause provides essentially the same restraint against federal impairment of the obligation of contracts [as the contract clause].

*Northwestern Nat'l. Life Ins. Co. v. Tahoe Regional Planning Agency,* 632 F.2d 104, 106 (9th Cir.1980); *see also Todd Shipyards Corp. v. Witthuhn,* 596 F.2d 899, 904 (9th Cir.1979) (Sneed, J., concurring).

*Turner Elkhorn Mining,* 428 U.S. at 18, 96 S.Ct. at 2893. In contrast, here there were no hidden risks, such as those of black lung disease, constituting a rational basis to alter drastically the expected economic balance.

In distinguishing *Allied Structural Steel* from the facts in *Nachman,* the Seventh Circuit emphasized that Title IV of ERISA "represent[s] a rational attempt to impose liability only to the extent necessary to achieve the legislative purpose." 592 F.2d at 962. The same cannot be said of the retroactive application of the Amendments Act. The withdrawal liability imposed on the employers for their pre-Amendments Act termination may well be disproportionate to the specific needs of the pension trust funds. Other legislative programs would have served the same purpose of ensuring financially healthy multiemployer plans. Those withdrawing prior to enactment of the Amendments Act were still contingently liable under ERISA. Additionally, employers could have been required to post a bond upon their withdrawal, or the withdrawal liability provisions of ERISA, while still contingent, could have been modified to provide a more secure "safety net" in the event a particular pension plan failed. Keeping in mind that we refer only to those employers who withdrew in the brief period between April 29, 1980 and September 26, 1980, and balancing the benefits to the multiemployer plans of imposing liability over and above the contingent liability already lawfully imposed by ERISA against the burden on the employers, we conclude that the equities weigh against retroactive application of the Amendments Act.

## D. MODERATING PROVISIONS

The absence of moderating provisions in the Amendments Act as applied retroactively is the most significant distinction between this case and *Nachman,* 592 F.2d at 962–63. The Amendments Act does not contain three major moderating provisions of ERISA: the contingent nature of the liability, the cap on payments placed at thirty percent of an employer's net worth, and the calculation of liability based on only the amount guaranteed by the Guaranty Corporation, not the full value of the employees' vested benefits. The Amendments Act nevertheless offers several mitigating provisions of its own. A mandatory "de minimis" exemption excuses in general all assessments under $50,000.00. 29 U.S.C. § 1389(a) (Supp. V 1981). A higher exemption is available if the trustees opt for it in their discretion. *Id.* at § 1389(b) (Supp. V 1981). Withdrawal liability is payable over time according to a schedule prescribed by statute. *Id.* at § 1399(c)(1) (Supp. V 1981). Liability is limited to the first twenty annual payments if more than twenty years are needed to amortize an employer's withdrawal liability. *Id.* at § 1399(c)(1)(B) (Supp. V 1981). Liability is reduced if the employer withdraws because it has liquidated or dissolved its business. *Id.* at § 1405 (Supp. V 1981).

We find little, if any, comfort for the employers in these provisions. The de minimis exemption may well be inapplicable, as it is here, and the further exemption can only be exercised by the trustees. The employers could not with certainty predict the form and passage of the Act, thus they could not choose to go out of business, or sell to a buyer in the industry. The twenty-year restriction, which does little to mitigate a large withdrawal liability, is inapplicable. The assessment of liability in monthly installments, as opposed to a lump sum payment, fails to mitigate the burden where the monthly payments would take an unreasonable amount of the employers' income. Finally, it is not clear, as Carpenters Pension Trust claims, that if the employers rejoin the plan, their liability would be abated or eliminated. Even assuming that the employers could rejoin their plans, pursuant to new collective bargaining agreements, the Guaranty Corporation has not yet adopted regulations regarding the possible reduction or waiver of liability where a former participant rejoins a plan.

We hold that retroactive application of the Amendments Act violated the employers' rights to due process as guaranteed by the fifth amendment. We take special care to note that our holding applies only to

those employers who withdrew before the enactment of the Amendments Act, but after the effective date of the Act. We express no opinion as to the constitutionality of the imposition of liability on employers who withdrew after September 26, 1980.

Since we find that the retroactive application of the Act is constitutionally invalid, we need not reach the issue of whether the imposition of liability constitutes a taking for which compensation is required, or any of the other numerous issues raised by the parties other than the award of attorney's fees.

## V. ATTORNEY'S FEES

The district court in *Shelter Framing* and related cases awarded attorney's fees under 29 U.S.C. § 1451(e) (Supp. V 1981).[13] The Act provides for award of fees to a party "who is adversely affected by the act or omission" of another party with respect to a multiemployer plan. The trust contends that it did nothing other than carry out the obligations imposed by the Amendments Act, thus it did not act or omit to act under its construction of the statute. The statute, however, contains no language which would restrict the terms "act or omission of any party" to conduct which is in violation of the provisions of the statute. We therefore hold that the language of the statute is broad enough to include an award for vindication of constitutional rights. The act of imposing substantial withdrawal liability upon the employers adversely affected them. Since Shelter Framing and G & R were clearly the "prevailing parties," they were entitled

to attorney's fees in the discretion of the district court. *See Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446, 452–53 (9th Cir.1980). We find no abuse of discretion and affirm the award. We also grant attorney's fees on appeal under 29 U.S.C. § 1451(e) to Shelter Framing and G & R, who requested such fees.[14]

The judgments in appeal numbers 82–5271, 82–5272, 82–5460 and 82–5461 are AFFIRMED. Our affirmance in appeal number 82–5461 disposes of the issues raised in cross-appeal number 82–5462, and we do not reach the contentions therein. The judgment in appeal number 82–3506 is REVERSED.[15]

---

13. The relevant sections read in pertinent part:
(a) Persons entitled to maintain actions. (1) A plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan, or an employee organization which represents such a plan participant or beneficiary for purposes of collective bargaining, may bring an action for appropriate legal or equitable relief, or both.
29 U.S.C. § 1451(a) (Supp. V 1981).
(e) Costs and expenses. In any action under this section, the court may award all or a portion of the costs and expenses incurred in

connection with such action, including reasonable attorney's fees, to the prevailing party.
29 U.S.C. § 1451(e) (Supp. V 1981).

14. Appellant R.A. Gray made no request for attorney's fees on appeal. *See* 9th Cir.R. 13(b)(1)(E).

15. Attorneys for G & R moved this court for sanctions against the Guaranty Corporation for alleged violation of Fed.R.App.P. 28(j) and 9th Cir.R. 13(g). We find no impropriety and deny the motion.