EDWARD C. REED, Jr., District Judge:
INTRODUCTION
This is a case brought by employer participants in a pension fund to enforce provi *494 sions of the Multiemployer Pension Plan Amendments Act of 1980 (“MPPAA”). All parties seek a declaration of the date on which the employers withdrew from the pension fund. The employers argue that they withdrew on September 1, 1983; the fund argues that the employers withdrew on May 23, 1983.
The district court granted summary judgment to the employers. The pension fund appeals.
The issues in this case involve construction of 29 U.S.C. §§ 1382, 1383, and 1392, provisions of the MPPAA. The United States District Court for the Southern District of California assumed jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1451. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.
FACTS
The facts relevant to this appeal are not in dispute. Neither side takes issue with the district court’s findings.
The appellant, San Diego and Imperial Counties Butchers’ and Food Employers’ Pension Trust Fund (“Pension Fund”), is a jointly trusteed labor-management trust fund created pursuant to the Labor-Management Relations Act of 1947 (“LMRA”). The Pension Fund exists pursuant to a declaration of trust and was organized to receive contributions and make payments for the purpose of providing retirement benefits to employees of participating employers. Appellant is a multiemployer employee benefit plan. See 29 U.S.C. §§ 1002(37)(A) and 1301(a)(3).
Cuyamaca Meats, Inc., C & M Meat Packing Corp., and National Meat Packers, Inc., (hereafter collectively referred to as “Employers”) were parties to identical collective bargaining agreements entered into in 1979 (“1979 CBAs”) with United Food and Commercial Workers, AFL-CIO, Local 229A (“Local 229A”). The 1979 CBAs expired, by their terms, on March 31, 1983. In the 1979 CBAs, each of the Employers agreed to accept the terms of and become a party to the trust agreement, which established the Pension Fund. Each Employer further agreed to contribute on a monthly basis to the Pension Fund specified sums based on hours worked by employees represented by Local 229A.
Negotiations between the Employers and Local 229A regarding new collective bargaining agreements commenced on March 28, 1983, just prior to the March 31, 1983, expiration of the 1979 CBAs. While negotiations continued, and following the expiration of the 1979 CBAs, the Employers continued to make contributions to the Pension Fund in accordance with the terms of the expired agreements.
On April 22, 1983, each of the Employers presented a written offer to Local 229A, termed a “final offer”. With respect to pensions, the offer proposed that the Employers would establish and contribute to individual retirement accounts on behalf of the employees. Implicit in the proposal was that the Employers would cease to contribute to the Pension Fund.
On May 2, 1983, Local 229A notified the Employers by telegram that the April 22 offer had been rejected by the union membership. The union requested additional negotiations.
Meanwhile, on April 29, 1983, the Pension Fund's attorney wrote a letter to the Employers’ attorney in response to the latter’s request. The letter said that the market value of the Pension Fund’s assets had increased significantly since the end of the last plan year, June 30, 1982. The level of assets of the Pension Fund was a key factor in determining the withdrawal liability that the Employers would incur upon separating from the Pension Fund, and the withdrawal liability would be calculated based upon the status of the Pension Fund as of the end of the last plan year. The letter to the Employers’ attorney stated that the increase in value of the assets of the Pension Fund was such that, if the last plan year had ended on March 31, 1983, instead of June 30, 1982, the Employers’ withdrawal liability would be reduced by almost one million dollars.
The next negotiating session was held May 5,1983. At that meeting, the Employ *495 ers revised their offer of April 22, 1983, with respect to retirement only, as follows: Amend Section XVIII, Retirement, to provide:
1. The Company shall continue its present pension plan through August 31, 1983, which shall be subject to an eligibility requirement of twelve (12) months’ continuous service.
2. The plan set forth in Section XVIII of the Companies’ April 22, 1983, proposal shall become effective September 1, 1983.
The parties could not reach agreement. On May 23, 1983, the Employers notified the union that an impasse existed.
On May 24, 1983, the Employers implemented the terms of their April 22 offer as modified on May 5, 1983. With respect to pensions, the proposal implemented by the Employers was that they would contribute to the Pension Fund through August 31, 1983. The Employers did tender such contributions through August 31, 1983; the Pension Fund, however, refused to accept them beginning on May 23, 1983.
On June 8, 1983, Local 229A commenced a strike and picketing against the Employers. On June 28,1983, Local 229A filed an unfair labor practices charge against the Employers with the National Labor Relations Board (“NLRB”). The union contended that no bona fide impasse existed on May 24, 1983, and that, therefore, the Employers were not privileged to implement their last offer. On August 11, 1983, the NLRB Regional Director dismissed the charges, and on October 31, 1983, the NLRB Office of Appeals upheld the dismissals, stating that a genuine impasse had occurred by May 24, 1983.
On September 30, 1983, the Pension Fund sent a letter to each of the Employers, stating that the Pension Fund had determined that the Employers had ceased to have an obligation to contribute to the Pension Fund as of May 23, 1983, because of impasse. The Pension Fund claimed that the Employers were indebted to it for the following withdrawal liability, calculated assuming a May 23, 1983, withdrawal date:
Cuyamaca Meats, Inc. $279,750.08
C & M Meat Packing Corp. 428,329.46
National Meat Packers, Inc. 146,127.28
The Pension Fund has not attempted to collect the withdrawal assessments during the pendency of this litigation.
In February, 1984, the Employers learned what their withdrawal liability would be if calculated assuming a withdrawal date of September 1, 1983, the date on which the Employers actually stopped tendering contributions to the Pension Fund:
Cuyamaca Meats, Inc. $ 38,213.76
C & M Meat Packing Corp. 48,226.50
National Meat Packers, Inc. 14,881.32
The appellees filed the complaint initiating the case at bar in the United States District Court for the Southern District of California on May 1, 1984. The appellant Pension Fund counter-claimed on May 22, 1984. On August 29, 1984, the appellees filed an amended complaint. Both sides seek a declaration of the date on which the Employers withdrew from the Pension Fund.
On cross-motions for summary judgment, the district court granted summary judgment in favor of the Employers, declaring that “the plaintiffs withdrew from the defendant Trust Fund on September 1, 1983.” Cuyamaca Meats, Inc. v. San Diego and Imperial Counties Butchers’ and Food Employers’ Pension Trust Fund, 638 F.Supp. 885, 891 (S.D.Cal.1986).
STANDARD OF REVIEW
A district court’s grant of summary judgment is reviewed de novo. Lojek v. Thomas, 716 F.2d 675, 677 (9th Cir.1983). In this case, the parties agree that there are no genuine issues of fact. Therefore, this Court need only decide whether the substantive law was properly applied. See United Food & Commercial Workers & Employers Arizona Health & Welfare Trust v. Pacyga, 801 F.2d 1157, 1159 (9th Cir.1986).
DISCUSSION: THE EMPLOYERS’ WITHDRAWAL FROM THE PENSION FUND
The MPPAA provides that when an employer withdraws from a multiemployer *496 pension plan, the employer becomes liable for its proportionate share of the plan’s unfunded vested liability. The purpose of this provision of the MPPAA is to ensure that multiemployer plans are not rendered insolvent by withdrawing employers. Board of Trustees v. Thompson Bldg. Materials, Inc., 749 F.2d 1396, 1401-02 (9th Cir.1984), cert. denied, 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985).
29 U.S.C. § 1381(a) states:
If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability.
This case involves a complete withdrawal. 29 U.S.C. § 1383(a) sets out the factors which indicate a complete withdrawal:
For purposes of this part, a complete withdrawal from a multiemployer plan occurs when an employer—
(1) permanently ceases to have an obligation to contribute under the plan, or
(2) permanently ceases all covered operations under the plan.
29 U.S.C. § 1392(a) contains the definition of “obligation to contribute”:
For purposes of this part, the term “obligation to contribute” means an obligation to contribute arising—
(1) under one or more collective bargaining (or related) agreements, or
(2) as a result of a duty under applicable labor-management relations law, but does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions.
The Employers had an obligation to contribute to the Pension Fund after impasse was reached in their negotiations with Local 229A. The obligation was one resulting from a duty under applicable labor-management relations law. Specifically, the obligation to contribute resulted from duties imposed upon the Employers by Section 8(a)(5) of the National Labor Relations Act (“NLRA”), 29 U.S.C. § 158(a)(5). That statute provides in relevant part:
It shall be an unfair labor practice for an employer — to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
Under 29 U.S.C. § 158(a)(5), an employer must maintain the conditions of employment set forth in an expired collective bargaining agreement until a new agreement is reached or until good faith negotiations result in a bona fide impasse. American Distrib. Co. v. NLRB, 715 F.2d 446, 449 (9th Cir.1983), cert. denied, 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984); Producers Dairy Delivery Co. v. Western Conference of Teamsters Pension Trust Fund, 654 F.2d 625, 627 (9th Cir.1981); Peerless Roofing Co. v. NLRB, 641 F.2d 734, 736 (9th Cir.1981).
When the negotiations reach impasse, the employer may unilaterally impose changes in the terms of employment if the changes were reasonably comprehended in the terms of its contract offers to the union. NLRB v. Crompton-Highland Mills, Inc., 337 U.S. 217, 223-25, 69 S.Ct. 960, 962-64, 93 L.Ed. 1320 (1949); Peerless Roofing, 641 F.2d at 735; Clear Pine Mouldings, Inc. v. NLRB, 632 F.2d 721, 729-30 (9th Cir.1980), cert. denied, 451 U.S. 984, 101 S.Ct. 2317, 68 L.Ed.2d 841 (1981); NLRB v. Andrew Jergens Co., 175 F.2d 130, 136 (9th Cir.1949), cert. denied, 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503 (1949). The crucial point of these authorities is that after impasse is reached an employer may unilaterally implement new terms of employment only if reasonably comprehended in a pre-impasse offer. The implementation of terms not reasonably comprehended in a pre-impasse offer is an indication that the employer failed to bargain collectively with the employees’ representatives as required by 29 U.S.C. § 158(a)(5).
Thus, after impasse, the employer’s options are governed by duties imposed by labor-management relations law.
Applying these principles to the case at hand, it is clear that there was no cessation of the Employers’ obligation to contribute to the Pension Fund as a result *497 of the impasse that occurred in the negotiations. After expiration of the 1979 CBAs, the Employers had a legal duty, under 29 U.S.C. § 158(a)(5), to continue to make contributions to the Pension Fund in accordance with the terms of the 1979 CBAs. When impasse occurred on May 23, 1983, the Employers were free to make unilateral changes in the terms of employment so long as such changes were reasonably comprehended by their offers to Local 229A. With respect to pensions, the Employers’ last offer contemplated continued contributions to the Pension Fund through August 31, 1983, and the establishment of a new retirement plan thereafter. After impasse the Employers implemented their final offer. They tendered contributions to the Pension Fund until September 1, 1983. The Employers tendered those contributions under an obligation to contribute to the Pension Fund within the meaning of 29 U.S.C. § 1392.
An employer who, after termination of a collective bargaining agreement mandating pension fund contributions and after impasse in negotiations with the employees’ union, continues to contribute to a pension fund in accordance with a unilaterally implemented offer made to the union during negotiations does so under an obligation to contribute resulting from a duty under applicable labor-management relations law within the meaning of 29 U.S.C. §§ 1383 and 1392.
This conclusion is particularly compelling in view of 29 U.S.C. § 1398(2):
Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because—
an employer suspends contributions under the plan during a labor dispute involving its employees.
This provision undermines the Pension Fund’s argument that withdrawal of the Employers occurred as a result of the impasse in negotiations. The mere existence of an impasse in negotiations does not lead to withdrawal, even if contributions by the employer to the pension fund cease. See T.I.M.E-DC, Inc. v. New York State Teamsters Conference Pension & Retirement Fund, 580 F.Supp. 621 (N.D.N.Y. 1984) (“Defendant suggests an impasse will trigger withdrawal liability. In fact, the concept of impasse is wholly irrelevant to the issues here. As merely a stage in the labor dispute, there is simply no talismanic significance to the presence of an ‘impasse.’ ” 580 F.Supp. at 629), aff'd., 735 F.2d 60 (2d Cir.1984); T.I.M.E.-DC, Inc. v. I.A.M. National Pension Fund, 597 F.Supp. 256, 263 (D.D.C.1984).
In the case at hand, the labor dispute and the impasse in negotiations did not result in cessation of the Employers’ contributions. Following impasse, the Employers continued to tender contributions to the Pension Fund. The impasse cannot be construed as effecting a withdrawal on the part of the Employers.
The appellant argues that Section 302(c)(5)(B) of the LMRA, 29 U.S.C. § 186(c)(5)(B), prohibited it from accepting contributions from the Employers after impasse.
29 U.S.C. § 186, in relevant part, provides:
(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, advisor, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or to agree to pay, lend, or deliver, any money or other thing of value—
(1) to any representative of any of his employees who are employed in an industry affecting commerce;
* # # * # *
(c) The provisions of this section shall not be applicable ... (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents ... Provided, That ... (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer____
*498 This section of the LMRA was intended by Congress to regulate payments by employers to employee representatives. It “was aimed at forestalling practices Congress considered injurious to the collective bargaining process such as bribery of employee representatives by employers, extortion by employee representatives, and the potential abuse of power by union officials armed with sole control of welfare funds.” NLRB v. United Brotherhood of Carpenters and Joiners of America, Local 1913, 531 F.2d 424, 427 (9th Cir.1976), citing, Arroyo v. United States, 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959).
29 U.S.C. § 186(c)(5) is an exception to an overall prohibition on payments by employers to employee representatives. The exception applies to sums paid to a trust fund established for the benefit of employees and their families, provided that the detailed written basis upon which such payments are to be made is specified in a written agreement. In this case, under well established authority in this circuit, the expired 1979 CBAs satisfied the written agreement requirement for the contributions tendered to the Pension Fund by the Employers after impasse in negotiations.
In NLRB v. Carilli, 648 F.2d 1206 (9th Cir.1981), an employer cited § 186(c)(5)(B) in attacking the NLRB’s finding that it violated Section 8(a)(5) of the NLRA by discontinuing payments to a trust fund. The court rejected the argument, holding that an expired collective bargaining agreement satisfied the § 186(c)(5)(B) requirement of a written agreement. As to the effect of impasse, the court stated:
By finding that the expired collective bargaining agreement and the trust agreements here are sufficient to permit continued payments to the trust funds, we do not, as Antonino’s contends, hinge criminal liability under Section 302(c)(5) [29 U.S.C. § 186(c)(5) ] upon the difficult determination of whether impasse has been reached. The collective bargaining and trust agreements here are sufficient to satisfy the requirements of Section 302(c)(5) and to permit continued payments to the trust funds, whether or not the parties have bargained to impasse.
Carilli, 648 F.2d at 1214.
In Producers Dairy Delivery Co. v. Western Conference of Teamsters Pension Trust Fund, 654 F.2d 625 (9th Cir. 1981), an employer who had continued to make contributions to a pension fund after expiration of a collective bargaining agreement and after impasse in negotiations sought a refund of the contributions made after impasse. The employer argued that 29 U.S.C. § 186(c)(5)(B) prohibited the pension fund from retaining the employer’s contributions after impasse in the absence of a new written agreement. The court held that § 186(c)(5)(B) did not prohibit the employer’s contributions after impasse because “the payments were made in conformity with the terms of an expired written agreement during the course of collective bargaining negotiations.” Id. at 627. The court went on to say “[i]t is lawful for an employer to continue the payments under these circumstances.” Id.
The authority in this circuit is clear: impasse in negotiations between employers and union does not prevent expired collective bargaining agreements from serving as the written agreements legitimizing subsequent pension fund contributions.
The appellant further argues that the expired collective bargaining agreements in this case cannot function as the written basis for post-impasse pension fund contributions because of the fact that those contributions were tendered under a pension plan with a new proviso, an eligibility requirement of twelve months’ continuous service. In fact, the new eligibility requirement did not affect the payments tendered after impasse. All contributions actually tendered to the Pension Fund by the Employers after impasse were tendered under the terms under which contributions had been made prior to expiration of the collective bargaining agreements. The new proviso only served to further circumscribe the employees on whose behalf contributions would be made. Remembering that the purpose of 29 U.S.C. § 186(c)(5) is to prevent payments by employers to employee *499 representatives which undermine the collective bargaining process, it is plain that the eligibility requirement added to the pension program by the Employers after impasse should not be deemed to have terminated the effect of the expired collective bargaining agreements as written agreements satisfying § 186(c)(5).
All contributions by the Employers to the Pension Fund after impasse were tendered on the basis of specific written agreements.
The appellant also argues that, under 29 U.S.C. § 1392(c), it was required to disregard the Employers’ final offer, providing for the Employers’ participation in the Pension Fund until September 1, 1983. 29 U.S.C. § 1392(c) states:
If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction.
The Employers concede that a purpose of their final offer of May 5, 1983, was to minimize their withdrawal liability. Even assuming that this aim was a principal purpose of the Employers’ last offer to the union, the legislative history suggests that the Employers’ May 5, 1983, offer was not a transaction covered by 29 U.S.C. § 1392(c).
The following was stated concerning 29 U.S.C. § 1392(c) during House debates:
[T]he bill provides that transactions undertaken to evade or avoid withdrawal liability may not be used as a method of escaping withdrawal liability that would otherwise be imposed. It is intended that the plan sponsor, the arbitrator, and the courts follow the substance rather than the form of such transactions in determining, assessing, and collecting withdrawal liability.
Furthermore, we intend that the term “employer” be construed in a manner consistent with the bill and its purposes. We intend that employers not be able to evade or avoid withdrawal liability through changes in identity, form, or control, or through transactions which are less than bona fide and arm’s length. Hence, for example, a building and construction industry employer — or for that matter any employer contributing to a plan — will not be able to evade withdrawal liability by going out of business and resuming business under a different identity.
126 Cong.Rec. 23038 (1980) (statement of Rep. Frank Thompson).
The Employers’ May 5, 1983, offer to Local 229A had economic substance. Every indication is that it was a .bona fide, arm’s-length offer made during negotiations concerning new collective bargaining agreements. The May 5 offer was not deceptive in any way, and it in no way frustrated the purposes of the MPPAA. It is true that the purpose, and an effect, of the May 5 offer was to delay the calculation of withdrawal liability until after June 30, 1983, and to thereby minimize such liability. Such an effect, however, was not an evasion or avoidance of withdrawal liability within the meaning of 29 U.S.C. § 1392(c).
The Employers’ reaction to the MPPAA, their delay in withdrawing from the Pension Fund, did not undermine the goals of the MPPAA. If an employer hesitates to withdraw from a multiemployer pension fund which has high unfunded benefit liability, the pension fund escapes the dangers sought to be abated by the withdrawal liability provisions. The Employers’ May 5, 1983, offer to Local 229A, and the Employers’ resulting delay in withdrawal from the Pension Fund was a candid reaction to the changing financial status of the Pension Fund and to the provisions of the MPPAA. The May 5, 1983, offer posed no threat to the financial stability of the Pension Fund.
Employer proposals made during negotiations toward a collective bargaining agreement, and motivated, at least in part, by a desire to minimize withdrawal liability, are not transactions entered into in order to evade or avoid withdrawal liability within the meaning of 29 U.S.C. § 1392(c).
In conclusion, this Court holds that the district court was correct in determining that the Employers withdrew from the Pension Fund on September 1,1983, when they *500 stopped tendering contributions to that fund, and not on May 23, 1983, when they reached impasse in their negotiations with Local 229A. This conclusion does not conflict with 29 U.S.C. § 186 or § 1392(c). DISCUSSION: APPELLEES’ ATTORNEY’S FEES ON APPEAL
The appellees argue that they are entitled to their attorney’s fees on appeal.
Section 4301(e) of the MPPAA, 29 U.S.C. § 1451(e), provides for the discretionary award of attorney’s fees to prevailing parties in cases initiated to enforce the provisions of the MPPAA. 29 U.S.C. § 1451(e):
In any action under this section, the court may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney’s fees, to the prevailing party.
Section 1451(e) allows the recovery of attorney’s fees and costs on appeal. See Shelter Framing Corp. v. Pension Benefit Guar. Corp., 705 F.2d 1502, 1515 (9th Cir. 1983), rev'd on other grounds sub nom, Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984).
The case of West v. Greyhound Corp., 813 F.2d 951 (9th Cir.1987) is helpful as to the factors relevant to the granting of attorney’s fees in this case. The appellee in West sought attorney’s fees under 29 U.S.C. § 1132(g), the attorney’s fee statute of the Employee Retirement Income Security Act of 1974 (“ERISA”). The courts have applied principles developed under the ERISA statute in cases under the MPPAA statute. See Shelter Framing, 705 F.2d at 1515; T.I.M.E-DC, Inc. v. I.A.M. National Pension Fund, 616 F.Supp. 400, 403 (D.D. C.1985). In West v. Greyhound Corp., 813 F.2d at 956, the court said:
The factors to be considered in awarding attorney’s fees are as follows: (1) the culpability or good faith of the opposing party; (2) the ability of opposing party to pay the award fees; (3) the degree of deterrence which would result from an award of fees; (4) whether a number of participants under an ERISA plan would benefit from an award of fees; and (5) the relative merits of the parties’ positions. Hummell v. S.E. Rykoff & Co., 634 F.2d 446, 453 (9th Cir.1980). In Operating Eng’rs Pension Trust v. Gilliam, 737 F.2d 1501, 1506 (9th Cir.1984), we stated that these “factors very frequently suggest that attorney’s fees should not be charged against ERISA plaintiffs.” We cannot say that the Union Workers have acted in bad faith or that their contentions were completely without merit. Accordingly, we reject ConAgra’s request for attorney’s fees.
In the case at bar, as well, the key factors are the appellant’s good faith or culpability and the relative merits of the parties’ positions. It is not clear that the Pension Fund acted in bad faith in this case. It is obvious that it acted to maximize the Employers’ withdrawal liability. Such a course is not an indication of culpability, however, to the extent the law supported the Pension Fund’s position. In that this case raised novel legal issues, the appellant cannot be expected to have known exactly the strength of the legal positions favoring its interests. Indeed, the Pension Fund’s contentions in this case have not been completely without merit. Accordingly, this Court rejects the Employers’ request for attorney’s fees.
ORDERS
The district court’s order granting summary judgment to appellees and denying summary judgment to appellants is AFFIRMED.
Appellees are denied attorney’s fees on appeal.