John L. CONNOLLY, et al.,
etc., Plaintiffs,

v.

PENSION BENEFIT GUARANTY CORPORATION, etc., Defendant,

Woodward Sand Co., Inc.; Penfield & Smith, Inc.; Klema Engineering, Inc.; and Municipal Engineers, Inc., Plaintiffs in Intervention.

No. CV–75–2037–DWW.

United States District Court,
C.D. California.

May 1, 1984.

Affirmed, 106 S.Ct. 1018.

---

Jett, Clifford & Laquer, Wayne Jett, Los Angeles, Cal., for plaintiffs.

Peter H. Gould, Pension Benefit Guar. Corp., George B. Driesen, Washington, D.C., for defendant Pension Benefit Guar. Corp.

Merrill, Schultz & Wolds Ltd., San Diego, Cal., for intervenors Woodward Sand Co., Inc.; Penfield & Smith, Inc.; Klema Engineering, Inc.; and Mun. Engineers, Inc.

Before NELSON, Circuit Judge, and WILLIAMS and KELLEHER, Senior District Judges.

## ORDER GRANTING SUMMARY JUDGMENT TO DEFENDANT

Plaintiffs, as trustees, ("Trustees") of the Operating Engineers Pension Trust ("Pension Trust"), a joint labor-management employee benefit trust created pursuant to Section 302(c)(5) of the Labor Management Relations Act of 1947 [29 U.S.C. § 186(c)(5)], seek summary judgment against defendant Pension Benefit Guaranty Corporation ("PBGC") to the effect that certain provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), as amended by the Multiemployer Pension Plan Amendment Act of 1980 ("MPPAA"), violate the Constitution of the United States. In particular, the Trustees contend that the provisions of the MPPAA imposing "withdrawal liability" on employers who ceased participation in the Pension Trust violate the fifth amendment of the Constitution by requiring private property to be transferred from one party to a second party for the second party's private use and benefit. In addition, the Trustees contend that the provisions of ERISA, as originally enacted and amended, requiring payments of "premiums" by the Pension Trust to PBGC, failed to accord the due process of law guaranteed by the fifth amendment.

Actions seeking to enjoin the operation of acts of Congress were, until 1976, required to be heard by district courts with three judges on the panel. Since this lawsuit was begun in 1975, it is properly before this three-judge court. *Connelly v. Penson Benefit Guaranty Corp.*, 673 F.2d 1110, 1113–14 n. 1 (9th Cir.1982).

There are no factual issues in dispute in this case. The date of intervenors' withdrawal from the pension plan is not relevant because intervenors do not challenge the retroactive application of the MPPAA. Such a challenge was rejected in *Shelter Framing Corp. v. Penson Benefit Guaranty Corp.*, 705 F.2d 1502 (9th Cir.1983), *prob. juris. noted sub nom PBGC v. R.A. Gray & Co.*, 464 U.S. 912, 104 S.Ct. 271, 78 L.Ed.2d 253 (1983) (hereinafter *"Shelter Framing"*). Moreover, this lawsuit challenges the facial constitutionality of Title IV and the MPPAA and does not challenge the statute as applied to particular persons. Hence, allegations regarding the particularized impact of the challenged legislation

on the parties' individual situations are of little relevance. We find that no triable issues of fact exist and, for the reasons set forth below, grant defendant's motion for summary judgment.

## BACKGROUND

■ In 1974, Congress attempted to regulate pension plans in a comprehensive manner.[1] To do so, it enacted the Employee Retirement Income Security Act. Title IV of ERISA was adopted to protect an employee's interest in his accrued benefit rights when a plan failed or terminated with insufficient funds. To achieve this goal, it established a system of termination insurance. *See Nachman Corp. v. Pension Benefit Guaranty Corp.*, 592 F.2d 947, 951 (7th Cir.1979), *aff'd*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). This termination insurance program is run by the PBGC. The PBGC is a governmental entity which receives no direct federal appropriations. Instead, it relies primarily on premium payments from private parties to insure against the failure of pension funds.

Upon enactment of ERISA in 1974, the PBGC immediately insured the receipt of all "non-forfeitable benefits" that had been earned by employees in single employer plans. A single employer who wished to terminate his plan was thus first required to notify the PBGC. 29 U.S.C. § 1341(a) (1976). If an investigation subsequently revealed that the plan lacked sufficient assets to pay its "non-forfeitable benefits," the PBGC itself became obligated for the shortfall. *Id.* at § 1341(c), (e).

Multiemployer plan benefits, in contrast, were not insured unconditionally upon enactment, but rather were guaranteed solely at the discretion of the PBGC until January 1, 1978. At that time, the guaranties were to become mandatory. *Id.* at 1381(c)(1). In the interim, the PBGC was authorized to determine on a case-by-case basis whether it would pay a terminating plan's beneficiaries the difference between the value of their guaranteed benefits and the value of

the plan's assets on the date of termination. *Id.* at § 1381(c)(2).

There were several reasons why Congress chose not to insure all multiemployer plan benefits immediately in 1974. Congress viewed multiemployer plans as more stable and secure than single employer plans and thus saw less need to insure the former. *See Connolly v. Pension Benefit Guaranty Corp.*, 581 F.2d 729, 734 (9th Cir.1978); 126 Cong.Rec. 12,179 (1980) (remarks of Rep. Biaggi). Moreover, Congress was concerned about the potential costs of such a program. Recognizing that it needed more time to study the entire problem, Congress delayed the effective date of the mandatory guarantee program and extended the PBGC's discretionary authority through June 30, 1979. Pub.L. No. 95–214, 91 Stat. 1501 (1977). At the same time, Congress ordered the PBGC to prepare a comprehensive report analyzing the multiemployer situation.

After extensive consideration, the MPPAA was enacted, affecting a variety of major changes in ERISA. Under the MPPAA, the PBGC is required to guarantee certain benefits of covered multi-employer plans. The level of benefits guaranteed by the PBGC under the MPPAA is lower than the level guaranteed prior to the passage of the MPPAA. The premiums employers must pay the PBGC for insurance are significantly higher under MPPAA. The PBGC is also authorized to provide financial assistance to plans which cannot meet their current financial obligatios. This permits a plan which is having financial difficulties to continue, and allows employers to continue making contributions to an insolvent plan without incurring liability under ERISA. Under the MPPAA, the insurable event for a plan is its insolvency, rather than its termination. The MPPAA further provides that the plan benefits are to be funded over a shorter period of time than formerly required and requires arbitration to resolve a wide variety

---

1. Our discussion of the legislative history of the MPPAA is adopted from the discussion set forth in *Peick v. Pension Benefit Guaranty Corp.*, 539 F.Supp. 1025 (N.D.Ill.1982), *aff'd*, 724 F.2d 1247 (7th Cir.1983) (hereinafter *"Peick"*).

of disputes between trustees and employers. Plaintiffs raise a number of constitutional challenges to the provisions of Title IV and the MPPAA.

DISCUSSION

A. THE TAKINGS CLAUSE.

Plaintiffs argue that contractual provisions creating investment backed expectations constitute compensable property rights just as much as actual ownership of property. Relying primarily on the recent Ninth Circuit case of *Midkiff v. Tom*, 702 F.2d 788 (9th Cir.1983), *prob. juris. noted*, 464 U.S. 932, 104 S.Ct. 334, 78 L.Ed.2d 304 (1983), they argue that employers would normally be required to liquidate other property, such as land, to pay withdrawal liability claims.

*Midkiff*, on its face, suggests that it does not control the case before us. *Midkiff* insists that if it had been reviewing "a *congressional* determination that there was a public use, not ... a state legislative determination," it might have reached a different result. 702 F.2d at 798. State legislative pronouncements, *Midkiff* concludes, are entitled to less deference than Congressional determinations. *Id.* Since the case before us, unlike *Midkiff*, involves a congressional finding, we could merely cite this analysis and move on. We choose not to do this, however, because to do so would be to endorse the *Midkiff* logic.

The *Midkiff* analysis seems inconsistent with what little Supreme Court precedent is available. The Supreme Court has never written that state legislative determinations are entitled to less deference than congressional determinations. To make it seem otherwise, *Midkiff* culls sentences from two unrelated cases, written 15 years apart, and stands them in juxtaposition. Thus, it offers this statement:

when *Congress* has spoken on the subject 'Its decision is entitled to deference until it is shown to involve an impossibility'

*T.V.A. v. Welch*, 327 U.S. 546, 552, 66 S.Ct. 715, 718, 90 L.Ed. 843 (1946), *quoting Old Dominion Land Co.*, 269 U.S. 55, 66, 46

S.Ct. 39, 40, 70 L.Ed. 162 (1925), in contrast with this one:

where a state legislative determination is involved: "[i]t is well established that ... the question what is a public use is a judicial one."

*Cincinnati v. Vester*, 281 U.S. 439, 446, 50 S.Ct. 360, 362, 74 L.Ed. 950 (1930), and concludes that state legislative findings are accorded little deference. 702 F.2d at 798. The Supreme Court did not intend, in either of these cases, to draw a line between state and federal legislative judgments. In fact, the quotation from *Vester* is equally applicable to Congress, and that from *T.V.A.* equally applicable to the states. Thus, *Midkiff* has created a distinction that the Supreme Court has never recognized and has, in fact, implicitly rejected. *E.g., Berman v. Parker*, 348 U.S. 26, 31–32, 75 S.Ct. 98, 101–02, 99 L.Ed. 27; *United States v. Gettysburg Electric Ry. Co.*, 160 U.S. 668, 680, 16 S.Ct. 427, 429, 40 L.Ed. 576 (1896).

Moreover, common sense suggests that state legislative determinations, if they are to be treated differently than congressional determinations, should be granted more, not less, deference. The tenth amendment reserves power to the states. To at least one commentator, "it seems clear that the reserve power of the state in this area is greater than the power of the federal government when the federal government is acting within the boundaries of a state." Conahan, *Hawaii's Land Reform Act: Is It Constitutional?* 6 Hawaii B.J. 31, 37 (1969). Thus, the distinction drawn in *Midkiff* between state and federal legislative findings seems an unlikely one.

■ The *Midkiff* distinction, however, is unnecessary to our holding here because we find that no "property" was involved in this case. Traditionally, it has been understood that to make a claim under the takings clause, the claimant must prove that "property," in the sense of "the group of rights inhering in the citizen's relation to [a] physical thing," has been "taken." *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 359–60, 89 L.Ed. 311 (1945). There has been no "set

formula" which the Supreme Court has evolved to determine when "'justice and fairness' require that economic injuries caused by public action be compensated by the government...." Rather, the Court has examined the "taking question by engaging in essentially ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action—that have particular significance." *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979), quoting *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

■ We find that the contractual right which insulates employers from further liability to the pension plans in which they participate is not "property" within the meaning of the takings clause. Although contractual rights may constitute property, *see Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), they must be very explicit to do so. In both *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), and *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the parties sought to protect interest in real property. Here, in sharp contrast, we are asked to protect a mere contractual arrangement. The importance of this distinction was reaffirmed by the Supreme Court in the recent case of *Security Industrial Bank v. United States*, 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1983). Since appellants are unable to identify any interests other than their purely contract-based "right" to avoid liability for further contributions to the pension plans to which they participate, we find no property at issue in this case. We refuse to consider the contingent right to escape one's own liability, in derogation of statutory policies, as property under the takings clause. Accordingly, we find no constitutional violation. *See Peick v. Pension Benefit Guaranty Corporation*, 724 F.2d 1247, 1274–75 (7th Cir.1983); *Dorn's*

*Transportation Inc. v. I.A.M. National Pension Fund, Benefit Plan A*, 578 F.Supp. 1222 (D.D.C.1984) (hereinafter *"Dorn's"*); *Speckman v. Paddock Chrysler Plymouth, Inc.*, 565 F.Supp. 469, 472–73 (E.D.Mo.1983). Since we resolve this issue on the basis of our finding that no "property" is affected by the MPPAA, we need not reach the questions whether a taking occurred or whether such a hypothetical taking would be for a public purpose.

## B. DUE PROCESS ANALYSIS.

If they do not affect property, provisions of Title IV and the MPPAA may yet be unconstitutional if they are not grounded in a rational basis. Plaintiffs argue that Title IV and the MPPAA achieve the reverse of their intended results. Specifically, Title IV and the MPPAA increase pension plan terminations and disrupt pension plans in general. Thus, plaintiffs argue, these statutes fail the rational basis test.

■ The burden of proof is on the challenging party to prove that Congress has acted in an arbitrary and irrational way. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15–16, 96 S.Ct. 2882, 2892–93, 49 L.Ed.2d 752 (1976). Since the due process challenge here involves only economic rights in general, this court merely must determine whether the statutes bear a rational relationship to their legitimate ends. *United States v. Carolene Products*, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); *Beller v. Middendorf*, 632 F.2d 788, 807–08 (9th Cir.1980). We find that both Title IV and the MPPAA are founded in rational bases.

■ To assess the constitutionality of the withdrawal liability provisions of the MPPAA, we must apply the analysis first set forth by the Seventh Circuit in *Nachman Corp. v. PBGC*, 592 F.2d 947, 960–63 (7th Cir.1979), *aff'd on other grounds*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980) (hereinafter *"Nachman"*). *See Textile Workers Pension Fund v. Standard Dye and Finishing Co., Inc.*, 725 F.2d 843

(2d Cir.1984) (hereinafter *"Textile Workers"*). Although much of the *Nachman* analysis is derived from contract clause considerations, those considerations are applied to the federal government through the due process clause. *See Shelter Framing,* 705 F.2d at 1510–11; *Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund,* 718 F.2d 628 (4th Cir.1983). *But see Dorn's,* slip. op. at 15. After pointing out that rationality is determined by comparing the identified problem to the nature and scope of the burden imposed to remedy it, the *Nachman* court considered four separate factors: 1) the reliance interest of the parties affected; 2) whether impairment of the private interest is effected in an area previously subjected to regulatory control; 3) the equities of imposing the legislative burdens; and 4) the inclusion of statutory provisions designed to limit and moderate the impact of the burdens. 592 F.2d at 960. The court emphasized that these four factors were only to be used to determined whether the legislation represented a rational means to a legitimate end, but were not to be used to express judicial approval or disapproval of the balance struck by Congress. *See id.* We address each of these four factors in turn.

█ First, we must analyze the reliance interest of the parties affected by the statute. Intervenors insist that they have relied on a basic contractual agreement that they will not have to pay more to the pension plan than their original required contributions. In *Nachman,* the court found that the employees' reliance on receiving their vested benefits outweighed the employer's reliance on its ability to terminate its obligations without continuing liability. Concededly, *Nachman* involved a single employer plan, while the instant case involves multiemployer plans where the participants do not have specific promises from their own employers to pay their pension benefits. "It is nonetheless reasonable and fair to conclude that plan participants did expect their employers to continue making contributions necessary to support these expected benefits." *Textile*

*Workers,* At 851. We conclude that the employers' reliance in their business dealings on their collective bargaining agreements is offset by employees' reliance in their personal affairs on obtaining vested pension benefits. The first *Nachman* factor does not weigh decidedly in favor of either party in this lawsuit.

█ The second *Nachman* factor is whether impairment of the private interest is affected in an area previously subjected to regulatory control. We find this factor to weigh heavily against the employers here. In *Nachman,* the court wrote that since plan terminations had previously been subject to federal regulation, an employer's expectation that it would not have to fund its plan's vested benefits could be given less weight by Congress. 592 F.2d at 962. In that case, the presence of Internal Revenue Service regulations governing plan terminations mitigated *Nachman's* claim of surprise when ERISA was enacted with termination liability provisions. *Id.* At n. 33. "Just as the employer in *Nachman* was charged with constructive notice that its rights might someday be subject to congressional regulation, so too were plaintiffs here. Notice was everywhere." *Textile Workers,* At 852; *see Shelter Framing Corp. v. Pension Benefit Guaranty Corp.,* 705 F.2d 1502, 1512 (9th Cir.1983) ("Pension plans have, of course, been subject to regulation at least since the passage of ERISA in 1974."). Before the employers decided to close their operations, there had been decades of pre-MPPAA regulation of multiemployer plans under a variety of federal labor and tax laws. *See Peick,* 539 F.Supp. at 1044. "The enactment of ERISA in 1974 provided a comprehensive regulatory scheme mandating employer withdrawal liability in the single employer context." *Textile Workers,* At 852. This "afforded clear warning that the federal government might one day act again and further buttress the legislative scheme it had created." *Peick,* 539 F.Supp. at 1044–45. (footnote omitted). Unlike *Shelter Framing,* we are not here addressing the effect of "legislative changes which extract

a heavy fine for action taken *before* the changes win congressional approval." 705 F.2d at 1512 (emphasis added). Here, of course, the actions are taken *after* congressional approval. We find that the MPPAA's effect was not completely unexpected, and that Act operated in an area that Title IV had previously regulated. The second *Nachman* factor therefore favors the constitutionality of the MPPAA.

The third *Nachman* factor involves weighing the equities of imposing the burden of withdrawal liability on the employer. Here, intervenors insist that the MPPAA has radically changed the pension plan "ground rules" and unfairly burdens employers who withdraw from pension plans.

When drafting the MPPAA, Congress was forced to determine who should bear the burden of any shortfalls in a multiemployer plans. We cannot find it unreasonable for Congress ultimately to decide to require the withdrawing employers to bear their share of the burden of funding, rather than to leave the remaining employers "holding the bag." *See* 126 Cong.Rec. 20,-234 (1980) (remarks of Senator Matsunaga).

The MPPAA itself clearly demonstrates that Congress did not place the entire burden of underfunding on the withdrawing employers. *Textile Workers,* slip op. at 947. Congress, for instance, required employers to make higher minimum contributions than under ERISA, 29 U.S.C. § 1423 (Supp. V 1981); the PBGC's insurance premiums were increased, *id.* § 1306; funds were made available to supplement plan assets so that insolvent plans could continue to operate with reduced benefit payments and without requiring prohibitively high employer contributions, *id.* § 1431; participant's benefits were made subject to limited reductions in financially troubled plans, *id.* § 1426; and the PBGC's guarantee was reduced, *id.* § 1322(a). *See Peick,* 539 F.Supp. at 1051–52; *Textile Workers,* At 853. Our view of prospective legislation is, of course, quite different from the "disfavor of retrospective legislation" that lay at the core of *Shelter Framing.* 705 F.2d

at 1512. We conclude, on balance, that the equities weigh in favor of the employees.

The final *Nachman* factor is whether the statute included provisions to limit and moderate the effect of the burdens it imposed. 592 F.2d at 962–63. The intervenors assert that the MPPAA has almost no moderating features. In a sense, they are correct. The statute does mitigate the effect of withdrawal liability to some extent by: a) limiting liability only to employers who voluntarily withdraw without a successor, 29 U.S.C. §§ 1384, 1390 & 1398, b) limiting the overall amount of withdrawal liability by a *de minimis* rule to eliminate the burden on small employers, 29 U.S.C. §§ 1389, 1405, c) permitting periodic installment payments of withdrawal liability, 29 U.S.C. § 1399(c), and d) allowing pension plans to fashion their own withdrawal rules, 29 U.S.C. § 1404. These provisions, however, may provide "little, if any, comfort for the employers." *Shelter Framing,* 705 F.2d at 1514. Accordingly, we find the fourth *Nachman* factor to weigh against the MPPAA's constitutionality. On balance, however, the *Nachman* analysis reveals that the MPPAA is constitutional.

## C. THE CONTRACT CLAUSE ISSUE.

The employers claim that the MPPAA retroactively impairs contractual relations in violation of the contract clause. *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). They argue that, like the statute struck down in *Allied,* the MPPAA grossly distorts employers' contractual obligations to their former employees by imposing obligations substantially beyond the terms of negotiated employment contracts.

Reliance on *Allied* is misplaced. In that case, the Supreme Court struck down as violative of the contract clause a Minnesota statute imposing pension fund liability on an employer. However, "a number of critical differences exist between the Minnesota statute and the MPPAA. Most significantly, *Allied* involved a state statute, not an act of Con-

gress. The prohibition against impairing the obligation of contracts is directed against state statutes." *Textile Workers,* At 857. We find the MPPAA to pass contract clause muster.

### D. REMAINING CONSTITUTIONAL CONTENTIONS.

 Plaintiffs assert that through Title IV Congress unconstitutionally delegated legislative discretion to appropriate agency funds. The argument is that it is improper to allow the PBGC to decide whether to pay unfunded vested benefits of plans that terminate before January 1, 1978. *See* 29 U.S.C. § 1181(c)(1) (repealed 1980). We find this issue moot since, as of July 1, 1980, the PBGC no longer has this discretionary power.

In the final pages of their Memorandum of Points and Authorities, intervenors raise several constitutional challenges to the MPPAA. They assert that the statute (a) involves a taking of property without a hearing, analogizing MPPAA withdrawal liability to a writ of garnishment, (b) fails to allow judicial participation prior to a seizing of property, (c) violates due process by giving the trustees' calculations of withdrawal liability a presumption of correctness, (d) deprives intervenors of a right to a jury trial, and (e) is unconstitutionally vague.

Intervenors were allowed to join in this litigation "on the condition that they do not litigate beyond the scope of plaintiffs' first amended complaint." *Connolly v. PBGC,* CV 75–2037 (C.D.Cal.1982) (order granting intervention). The first amended complaint focuses on the MPPAA's disruption of existing collective bargaining relationships, and its alleged unconstitutional taking of property without compensation or rational basis. Nowhere in the complaint are there facts alleged which would support the additional procedural due process claims advanced by the intervenors. These contentions are hereby ordered stricken from the record. They are outside the confines of the first amended complaint

and beyond the scope of permissive intervention.

### CONCLUSION

Summary judgment is granted in favor of the defendant as to all of plaintiffs' and intervenors' facial constitutional challenges. We do not, however, resolve the constitutionality of the statutes as applied to particular parties. That issue, not raised by this lawsuit, is being litigated in another district.

SO ORDERED.