PRO SCHOOLS, INC., Plaintiff,

v.

Richard W. RILEY, Secretary of Education in his official capacity, and The United States Department of Education, an agency of the United States of America, Defendants.

No. 93–C–113.

United States District Court,
E.D. Wisconsin.

June 25, 1993.

Blumenthal, Jacquart, Blumenthal, Leib & Phelps by Robert B. Shelledy and Robb A. Marcus, Milwaukee, WI, for plaintiff.

Lynne M. Solein, Asst. U.S. Atty., Milwaukee, WI, Ronald B. Sann, Office of Gen. Counsel, U.S. Dept. of Educ., Washington, DC, for defendants.

## DECISION AND ORDER

RANDA, District Judge.

The plaintiff, Pro Schools, Inc. ("Pro Schools"), commenced this lawsuit seeking preliminary and permanent injunctive relief enjoining the defendants, the Secretary of Education and the Department of Education (collectively, "the Secretary"), from terminating its eligibility to participate in the Federal Family Education Loan program. (Complaint at 7–8.) After a hearing held on February 17, 1993, the Court denied and dismissed the claims for injunctive relief on the grounds that the Court had no authority to issue an injunction against the Secretary. With ·the Court's permission, Pro Schools immediately filed an Amended Complaint

seeking declaratory relief ordering the reinstatement of its eligibility for federal education loans and also seeking interim compensatory damages incurred as a result of its current ineligibility. (Amended Complaint at 8–9.)

The Amended Complaint raised four separate grounds for relief: (1) Pro Schools' liberty and property interests were deprived without due process of law because the Secretary's decision was arbitrarily reached without a full record hearing before an administrative law judge; (2) the Secretary violated the HEA by failing to provide Pro Schools with a record hearing, by miscalculating the applicable cohort default rates, and by failing to find that exceptional mitigating circumstances rendered termination inequitable; (3) the Secretary violated applicable regulations and statutes by failing to issue a decision on Pro Schools' appeal within 45 days and by applying the 35% cohort default rate retroactively; and (4) the Secretary's actions were arbitrary and capricious and therefore violated the Administrative Procedures Act ("APA"). (Amended Complaint at 4–7.)

The matter comes before the Court on the parties' cross-motions for summary judgment. For the following reasons, the Court grants the Secretary's motion and dismisses the case.

## STATUTORY AND REGULATORY BACKGROUND

It makes sense to begin with the statutory and regulatory framework under which the current dispute arises. Title IV of the Higher Education Act of 1965 ("HEA") created the Guaranteed Student Loan program ("GSL"). The Higher Education Amendments of 1992 changed GSL's name to the Federal Family Education Loan program ("FFEL"). FFEL is an umbrella term referring to four different loan programs: (1) the Federal Stafford Loan program; (2) the Federal Supplemental Loans for Students program; (3) the Federal PLUS program; and (4) the Federal Consolidation Loan program. The Secretary of Education ("the Secretary") is responsible for administering these programs and is authorized to issue regulations to carry out the corresponding statutes. 20 U.S.C. § 1082(a)(1).

Under the FFEL programs a student receives a loan from a participating lender to cover tuition, fees and living expenses relating to attendance at an eligible post-secondary institution. 20 U.S.C. § 1071, 34 C.F.R. § 682.100. Repayment of the loan is insured by a state or private non-profit guaranty agency. 20 U.S.C. § 1078(b) and (c). The Department of Education ("the Department") provides reinsurance for the guaranty agency, 20 U.S.C. § 1078(c), 34 C.F.R. § 682.404, meaning that it will pay off a defaulted loan with federal funds after specified collection efforts have failed. *Association of Accredited Cosmetology v. Alexander,* 979 F.2d 859, 860 (D.C.Cir.1992).

To participate in the FFEL programs, a school must apply to the Department for eligibility and certification. *Id.* Certification turns upon the satisfaction of several statutory and regulatory requirements. *Id.* Once approved to participate, the school must sign a contract with the Department called a "Program Participation Agreement". *Id.* By signing the Agreement, the school agrees, *inter alia,* "to comply with all the relevant program statutes and regulations governing the operation of each Title IV, HEA program in which it participates" and further agrees that the Agreement "automatically terminates ... on the date the institution no longer qualifies as an eligible institution." *Id.* (*See also,* Defendant's Brief at 5.)

The Department has various tools and powers by which to police the administration of the FFEL programs. The Department may limit, suspend or terminate the participation of a school in these programs, may fine a school for violations of program rules and may demand repayment of improperly utilized funds. 20 U.S.C. § 1094(b) and (c); 34 C.F.R. Part 668, Subparts G and H. Prior to 1992, the Department had to provide a hearing "on the record" before it could terminate or otherwise limit a school's participation in Title IV programs. 20 U.S.C.A. § 1094(b) and (c) (1990). The Higher Education Amendments of 1992 eliminated the requirement for "record" hearings. 20 U.S.C.A. § 1094(b) and (c) (Supp.1993).

During the 1980's, the Department experienced "an ever-increasing number of defaulted loans." *Association*, 979 F.2d at 860. Between 1983 and 1989, the number of loan defaults increased by 338%, and the cost of these loan defaults as a percentage of total program expenses jumped from about 10% in 1980 to more than 50% in 1990. *Id.;* See also, "Abuses in Federal Student Aid Programs", Report by the Permanent Subcommittee on Government Affairs, S.Rpt. 102–58 (May 17, 1991) ("the Senate Report"). More importantly, a disproportionate amount of loan defaults were attributable to "proprietary" (for profit) trade schools—like those operated by the plaintiff—whose combined 50.6% default rate was almost twice the national average. *Id.,* at 861; (Id.) Indeed, a GAO report found that about half of the approximately 2200 proprietary schools had default rates over 20% and concluded that high default rates were warning signs of potential abuse. Senate Report at 10. Other evidence even showed that some proprietary schools defrauded the Department by, among other things, "realiz[ing] enormous profits by increasing tuition without cost-justification." *Id.*

Congress took steps to address the foregoing problems. As part of the Omnibus Budget Reconciliation Act of 1990, Congress enacted the Student Loan Default Prevention Initiative Act ("SLDPIA"), which amended the definition of an "eligible institution" so as to tie a school's continued eligibility for FFEL loans to the maintenance of a satisfactory default rate:

**(2) Ineligibility based on high default rates**

(A) An institution whose cohort default rate is equal to or greater than the threshold percentage specified in subparagraph (B) for each of the three most recent fiscal years for which data are available shall not be eligible to participate in a program under this part for the fiscal year for which the determination is made and for the two succeeding fiscal years, unless, within 30 days of receiving notification from the Secretary of the loss of eligibility under this paragraph, the institution appeals the loss of its eligibility to the Secretary. The Secretary shall issue a decision on any such appeal within 45 days after its submission....

\* \* \* \* \* \*

(B) For purposes of determinations under subparagraph (A), the threshold percentage is—

(i) 35 percent for fiscal year 1991 and 1992;

(ii) 30 percent for fiscal year 1993; and

(iii) 25 percent for any succeeding fiscal year.

20 U.S.C.A. § 1085(a)(2)(A) and (B) (Supp. 1993). The SLDPIA defined and determined the "cohort default rate", critical to the determination of an institution's continued eligibility, as follows:

**(m) Cohort default rate**

**(1) In general**

(A) Except as provided in paragraph (2), the term "cohort default rate" means, for any fiscal year in which 30 or more current and former students at the institution enter repayment on loans under section 1078 or 1078–1 of this title received for attendance at the institution, the percentage of those current and former students who enter repayment on such loans received for attendance at that institution in that fiscal year who default before the end of the following fiscal year.

20 U.S.C.A. § 1085(m)(1)(A) (Supp.1993).[1] A school's loss of eligibility under the foregoing sections can be appealed on only two grounds; (1) miscalculation of the cohort default rate and (2) exceptional mitigating circumstances. 20 U.S.C.A. § 1085(a)(2)(A)(i) and (ii) (Supp.1993).

---

1. "From this definition, it follows that a school's cohort default rate for a given fiscal year cannot be calculated until two years later." *Association,* 979 F.2d at 861. This is because "[t]he [cohort default rate] for a given fiscal year is calculated according to the number of students who default by the end of the next fiscal year." *Id.* Thus, when determining a school's FFEL eligibility in fiscal year 1992, as was done here, the three most recent fiscal years for which data is available are fiscal years 1988, 1989 and 1990.

## FACTUAL BACKGROUND

Pro Schools is a Wisconsin corporation operating seven cosmetology schools, six of which are located in Wisconsin and the seventh in Rockford, Illinois. (Smith Aff. at ¶¶ 1–2.) Pro Schools purchased the seven schools from IBA Accredited, Inc. ("IBA") in October of 1991. (Id. at ¶ 2.) IBA was apparently part of a large, interrelated corporate chain that owned a series of cosmetology schools across the nation. (Plaintiff's Brief at 6, n. 2.) Richard Smith, Pro Schools' president and sole shareholder, worked for IBA from February of 1990 until August of 1991, when he resigned to incorporate Pro Schools and purchase the seven schools at issue. (Id. at ¶¶ 3–5.) There is no evidence that Smith or Pro Schools had any prior ownership interest in IBA or any of its related corporations. (Smith at ¶ 7.) [2]

As discussed above, the seven schools now owned by Pro Schools were part of the IBA corporate chain during fiscal years 1988–1990. (Defendant's Proposed Findings of Fact ("Def. FOF") at ¶ 3.) Technically, it appears that each school in the IBA chain was a "free-standing" institution. This meant, among other things, that each school would normally have had its own separate cohort default rate based only upon loans certified or processed using that school's separate identification number. As such, the FFEL eligibility of the IBA corporate chain would normally have been determined on a school-by-school basis.

The Department did not apply these principles to IBA. The Department determined that the IBA schools were certifying virtually all of their loans under a single school ID number (007674) even though each school had its own separate ID number. (AR 4 and 5.) Specifically, 1577 out of 1612 loans (98%) processed in fiscal year 1988 used this same ID number, 1310 out of 1368 loans (96%) processed in fiscal year 1989 used the number, and 793 out of 872 loans (91%) processed in fiscal year 1990 used the number.[3] (Coombs February 12, 1993 Decl. ("Coombs Decl.") at ¶ 13.) As a result, the Department decided to "merge" the cohort default rates of all the IBA schools for these fiscal years into one single rate, and further to apply that "merged" rate to each IBA school. (AR 5–7.) The Department formally notified IBA of the merged rate analysis, and its possible implications regarding IBA's eligibility for FFEL loans, in April and June of 1991 (AR 5–6), although IBA was aware of the same as early as December of 1990 (AR 3) and/or January of 1991 (AR 4.)

In or through August to October of 1991 (shortly after IBA received formal notice of the Department's intention to apply a merged cohort default rate to IBA's schools) Smith formed Pro Schools and purchased the seven schools at issue.[4] (Smith Aff. at ¶¶ 1–2.) Upon purchasing the schools Smith, as Pro Schools' president, signed "Ownership Change Certification[s]" certifying that each school would be operated as a mere "continuation of the same school" formerly owned by

2. The Court notes, however, that Smith was described as IBA's "Chief Operating Officer" in the Asset Sale Agreement executed between IBA and Pro Schools in October of 1991. (Administrative Record ("AR") 10, Ex. C at 5.)

3. The reasons for this practice are unknown, at least on the present record. The Administrative Record shows that IBA previously claimed it did so pursuant to written permission from the Department, but upon request IBA failed to produce any documentation supporting this claim. (AR 12 at 1.) It is also unknown as to when the practice stopped. Indications are that it stopped sometime in fiscal year 1990. Smith claims that separate ID numbers were used during his entire employment with IBA, which began in February of 1990. (Smith Aff. at ¶ 6.) Another IBA official thought the practice ceased in November of 1989, but there is no confirmation of this, written

or otherwise. (AR 12 at 1.) In any event, the undisputed figures show that 91% of IBA loans processed during fiscal year 1990 were certified under the same school ID number. (Coombs Decl. at ¶ 13.) If the practice stopped in fiscal year 1990, it stopped relatively late in the process.

4. As stated earlier (see footnote 2, supra), Smith was IBA's Chief Operating Officer at the time the Department's notices were received by IBA, so he must have been aware of the threat which merged cohort default rates presented to the continued eligibility of the IBA schools for FFEL loans at the time he formed Pro Schools and purchased the seven schools. One can only assume that Smith assumed the change in ownership would prevent the application of IBA's merged cohort default rates to the seven schools he purchased.

IBA. (Sedicum Decl. at ¶ 2, Ex. 1.) The certifications triggered various regulatory obligations and benefits, the most significant benefit being that the seven "continuation" schools would retain their eligibility to participate in the FFEL program and would not have to wait the standard two year period applicable to "new" schools. 34 C.F.R. § 600.31(a) and (e).

In July of 1992, the Department notified Pro Schools that none of its schools would continue to be eligible to participate in the FFEL program. (AR 7; Plaintiff's Proposed Findings of Fact ("Pla. FOF") at ¶ 5.) Termination was based upon the merged cohort default rates for all of IBA's schools during each of the fiscal years 1988, 1989 and 1990. (AR 7; Pla. FOF at ¶¶ 6–9.) Application of IBA's merged default rates to the seven "continuation" schools was critical to the Department's determination of ineligibility. According to Pro Schools' calculations, none of the seven schools (taken separately or as a group) had default rates in excess of the 35% threshold for fiscal years 1989–90. (Smith Aff. at ¶¶ 12–28.)[5]

On July 31, 1992, Pro Schools notified the Department of its intention to appeal the loss of eligibility. (AR 9.) Pro Schools finalized its appeal papers on August 31, 1992. (AR 10.) The appeal challenged the Department's alleged miscalculation of the cohort default rates by including 12 students who attended a Tennessee school and seven students who were in "DR Defaulted Repayment Status", meaning they had defaulted but subsequently began making payments again. (AR 10.)[6] Pro Schools did not argue that applying IBA's merged cohort default rates to the seven continuation schools was

improper. Nor did it argue that there were "exceptional mitigating circumstances" making the sanction of termination "inequitable" under 20 U.S.C.A. § 1085(a)(2)(A)(ii). The Department rejected the appeal and formally terminated Pro Schools' eligibility on January 26, 1993. (AR 11.) Pro Schools subsequently filed this lawsuit.

## LEGAL ANALYSIS

The Court addresses the factual and legal issues raised by the Amended Complaint in the following order.

### I. RETROACTIVITY

Pro Schools claims that the Secretary's use of the 35% cohort default rate for fiscal years 1988 and 1989 gives retroactive effect to the SLDPIA, "which is violative of the applicable Federal statutes." (Amended Complaint at ¶ 27.) This claim is easily disposed of. In *Association of Accredited Cosmetology v. Alexander*, 979 F.2d 859, 863–66 (D.C.Cir.1992), the D.C. Court of Appeals held that neither the SLDPIA nor the corresponding regulations are retroactive because they do not "affect[ ] in the slightest member schools' past eligibility for GSL program participation" and only require the Secretary "to consider ... *past* default rates" when "determining member schools' *future* eligibility...." *Id.*, at 864. (Emphasis supplied.) Because the Act and its regulations did not have a retroactive effect upon eligible schools, the Court did not have to consider whether Congress intended the SLDPIA to apply retroactively. *Id.*, at 866. These same principles apply here to defeat Pro Schools' retroactivity claim.[7]

5. The Secretary objects to Pro Schools' submission of separate cohort default rates for the seven continuation schools because neither these rates, nor the argument that they should be the applicable rates for eligibility purposes, were submitted to or raised before the Department during Pro Schools' administrative appeal. (Defendant's Reply Brief at 10–13.) As discussed below, the Court agrees that such evidence and arguments cannot be considered for the first time on appeal. (*See* Section IV–A, *infra.*) The Court references these figures only because, even if they were properly before the Court, the Court's decision would not change. (*See* Sections IV–B(2) and (5), *infra.*)

6. Pro Schools also argued that a 50% reduction in its excess default rate between fiscal years 1988 and 1989 justified reinstatement. (AR 10.) Pro Schools now withdraws that argument, agreeing with the Secretary that the regulation this argument was based upon does not apply. (Plaintiff's Brief at 19, n. 3.)

7. Indeed, in what may be tacit recognition that the claim bears little merit since the Court's decision in *Association of Accredited Cosmetology*, Pro Schools does not even address the retroactivity claim in its briefing on the cross-motions for summary judgment.

## II. THE 45–DAY DECISION PERIOD

■ As stated earlier, after a school receives notice that its eligibility to participate in the FFEL program is being terminated, it may appeal the Department's determination administratively. 20 U.S.C. § 1085(a)(2)(A) states that "[t]he Secretary *shall* issue a decision on any such appeal within 45 days after its submission." (Emphasis supplied.) It is undisputed that the Secretary failed to issue his decision within the 45–day time period. Pro Schools argues that this renders the Secretary's decision "arbitrary and capricious" and therefore violative of both the Administrative Procedures Act ("APA") and the SLDPIA. (Amended Complaint at ¶¶ 26, 30(a); Plaintiff's Brief at 22–23.)

Case law suggests that a statutory time period like the one involved here is not mandatory simply because it uses the word *shall:*

> The general rule is that "[a] statutory time period is not mandatory unless it *both* expressly requires an agency or public official to act within a particular time period *and* specifies a consequence for failure to comply with the provision."

*McCarthney v. Busey,* 954 F.2d 1147, 1152 (6th Cir.1992), quoting *St. Regis Mohawk Tribe, New York v. Brock,* 769 F.2d 37, 41 (2nd Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986). Here, while the Act requires the Secretary to issue a decision within 45 days, nothing in the Act specifies what the consequences will be if the Secretary fails to do so. Under the foregoing case law, this renders the time period directory in nature. The fact that none of the cases cited by the Secretary in this regard interpreted the SLDPIA does not, as Pro Schools argues, distinguish those cases from the situation before this Court. The cases refer to the principle as a "general rule" and do not limit its application to the specific statute at issue. Accordingly, the Secretary's decision to terminate Pro Schools' eligibility is not rendered invalid by the Secretary's delay in disposing of the appeal.

## III. DUE PROCESS

■ Pro Schools was not provided a hearing on the record before an administrative law judge (ALJ) either prior to or after being notified that its FFEL eligibility was being terminated. Instead, Pro Schools was allowed to appeal the Secretary's decision by means of a written brief and/or other written materials specifying its objections to the decision. Pro Schools argues that this violated 20 U.S.C. § 1094(c) and further deprived it of a constitutionally protected liberty and property interest without procedural due process of law. (Amended Complaint at ¶¶ 15–19, 21–22.) Pro Schools also seems to argue that the Secretary's use of a merged cohort default rate violated its substantive due process rights. (Plaintiff's Brief at 22–23.) Neither the statutory nor the constitutional claims may stand.

As for the statutory basis of its claim, Pro Schools neglects or ignores recent amendments that have removed the requirement for a hearing on the record prior to termination. The former statutory provision, 20 U.S.C.A. § 1094(c)(1)(D) (1990), allowed the Secretary to terminate an institution's FFEL eligibility only "after reasonable notice and opportunity for hearing on the record, ...." The amended provision drops the "on the record" language. 20 U.S.C.A. § 1094(c)(1)(F) (Supp.1993). Congress was confident that "[i]nstitutions will still receive adequate due process without the cumbersome and lengthy process that often results from "on the record" hearings." *See,* Higher Education Amendments of 1992, Pub.L. No. 102–325, H.Rep. No. 102–447 at 83, U.S.Code Cong. & Admin.News 1992, pp. 334, 416. Subsequent regulations issued by the Secretary further specified that the decision on appeal would be "based on the consideration of *written* material submitted by the institution. No oral hearing is provided." 34 C.F.R. § 668.15(g)(1)(iii)(B)(5) (emphasis supplied). Based on these provisions, Pro Schools cannot claim a statutory or regulatory right to a record hearing before an ALJ.

As for the due process claim, the Court is somewhat confused by Pro Schools' presentation on this issue. In the Amended Complaint, Pro Schools alleges that it was deprived of procedural due process because it "was not allowed a full hearing on the record" and "was not allowed the opportunity to

make written submissions to an administrative law judge". (Amended Complaint at ¶¶ 18(a) & (b).) In its brief, Pro Schools argues that the Department's "application of the merged CDR [cohort default rate]", "plain misreading of 20 U.S.C. Section 1085" and "failure to timely respond to the appeal" violated Pro Schools' due process rights. (Plaintiff's Brief at 22–23.) The brief makes no mention of procedural due process or the Secretary's failure to provide a record hearing before an ALJ. Thus, the Amended Complaint sounds in procedural due process while Pro Schools' brief seems to argue something akin to substantive due process. The Court will address both claims.

■ As for procedural due process, it is clear that the case of *Continental Training Services, Inc. v. Cavazos,* 893 F.2d 877 (7th Cir.1990) controls the Court's decision here. In *Continental,* the Seventh Circuit considered the question of what pre-termination process is constitutionally required before the Secretary may terminate an institution's eligibility for student financial aid under the HEA. The Court first concluded that continued eligibility for such aid constituted both a liberty and property interest that could not be deprived without some pre-deprivation process. *Continental,* 893 F.2d at 892–93. The Court then considered how much process was required. Analogizing it to the termination of disability benefits, the Court noted that "no oral presentation of any kind was necessary" before terminating such benefits and that "existing provisions permitting predeprivation written submissions sufficed." *Id.,* at 893–94, citing *Mathews v. Eldridge,* 424 U.S. 319, 343–48, 96 S.Ct. 893, 907–09, 47 L.Ed.2d 18 (1976). Given that prior written submissions sufficed for disability claimants themselves, it followed that the same certainly sufficed for the termination of any Medicare provider which might be the indirect beneficiary of such benefits. After all, the "private interest involved in the termination of a Medicare provider agreement is less

weighty than the interest of a disability claimant." *Id.,* at 893–94, citing *Northlake Community Hospital v. United States,* 654 F.2d 1234, 1242 (7th Cir.1981). Similarly, as an indirect beneficiary of student financial aid, the termination of a schools' student loan eligibility can proceed on the basis of written submissions only.[8] *Id.,* at 893–94. Here, the regulations provided for written submissions, prior to termination, and Pro Schools utilized that procedure. Given the foregoing, the Court does not find such pre-termination process constitutionally inadequate.

■ As for substantive due process, the Court assumes that Pro Schools is arguing that the application of a merged cohort default rate, regardless of the process provided, violates 5th Amendment due process. (Plaintiff's Brief at 22–23.) Under the 5th Amendment, "regulation having an adverse economic impact is subject to attack on substantive due process grounds if it is arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adapt." *Medical Malpractice Underwriting Ass'n v. Paradis,* 756 F.Supp. 669, 675 (D.R.I.1991), quoting *Pennell v. San Jose,* 485 U.S. 1, 11, 108 S.Ct. 849, 857, 99 L.Ed.2d 1 (1988). It will be upheld so long as "the regulation is rationally related to a legitimate state interest." *Id.* "The burden of proof is on the challenging party to prove that Congress [or the administrative agency] has acted in an arbitrary and irrational manner." *Connolly v. Pension Benefit Guaranty Corp.,* 631 F.Supp. 640, 645 (C.D.Cal.1984). The burden is high and is not met by simply showing that the Government violated some legal norm:

> Substantive due process doctrine does not protect individuals from all actions that infringe liberty or injure property in violation of some law. Rather, substantive due process prevents "governmental power from being used for purposes of oppression," ... or "abuse of government power that shocks the conscience," ... or action

8. While the institution involved in *Continental* received at least two opportunities to make *oral* submissions to the Department, nothing in the Court's opinion indicates that such submissions were required to comply with due process. More importantly, neither of the oral submissions were on the record and none of the submissions, either written or oral, were made to an ALJ. Thus, nothing in *Continental* stands for Pro Schools' proposition that due process requires a pre-deprivation record hearing and oral or written submissions to an ALJ.

that is "legally irrational [in that] it is not sufficiently keyed to any legitimate state interests."

*Committee of U.S. Citizens in Nicaragua v. Reagan,* 859 F.2d 929, 943–44 (D.C.Cir.1988). (Citations omitted.)

Even if the Secretary misinterpreted the SLDPIA or the regulations issued pursuant thereto by using a "merged" cohort default rate (which he did not, *see* Section IV–B(2) & (5), *infra* ), it is hardly a misinterpretation that "shocks the conscience" or which is "used for purposes of oppression." Proprietary schools such as these have disproportionately fueled a dramatic increase in student loan defaults. Congress has a legitimate interest in taking aggressive steps to reverse this trend, both to protect the student from assuming an unrealistic debt load and to protect the American taxpayer from footing the bill. Preventing schools with high default rates from avoiding eligibility requirements through a change in ownership—even changes engineered by good faith, arms-length transactions—is rationally related to these legitimate interests.

## IV. ARBITRARY AND CAPRICIOUS

Pro Schools also argues that the Secretary's actions should be set aside as arbitrary and capricious. Again, the allegations in the Amended Complaint tend to vary from Pro Schools' briefing on the issue, but taken together they create the following list of objections to the Secretary's action:

(1) The Secretary did not issue his decision within 45 days as required by 34 C.F.R. 668.15(g)(4) (Amended Complaint at ¶ 30(a); Plaintiff's Brief at 22–23);

(2) The Secretary wrongfully applied IBA's merged cohort default rate to Pro Schools (Amended Complaint at ¶ 30(d), Plaintiff's Brief at 11–18);

(3) The Secretary wrongfully included 12 Tennessee students and 7 students in "DR Defaulted Repayment Status" in the computation of Pro Schools' cohort

default rate (Amended Complaint at ¶ 30(c));

(4) The Secretary may have wrongfully included defaulted loans that should have been excluded due to improper servicing or collection (Plaintiff's Brief at 19–21);

(5) The Secretary failed to find that exceptional mitigating circumstances existed making termination inequitable (Amended Complaint at ¶ 23(b)); and

(6) The Secretary did not conduct an independent review of the evidence submitted by Pro Schools and failed to provide a reasonable explanation for its action and a clear standard governing his decision. (Amended Complaint at ¶ 30(b) & (e).)

None of these objections render the Secretary's decision arbitrary and capricious.

### A. Failure to raise these objections before the Secretary on appeal.

■ Pro Schools' administrative appeal in this matter was fairly limited. Although the statute provided two possible bases for appeal (*i.e.,* inaccurate calculation of cohort default rates and/or exceptional mitigating circumstances), Pro Schools chose to object only on grounds of the Secretary's calculation of the cohort default rate for fiscal year 1990:

Pro Schools, Inc., a Wisconsin Corporation, does hereby appeal the loss of eligibility of Pro Schools, Inc. to participate in the student loan programs (GSL) based upon erroneous data incorrectly included in the calculation of the Cohort Default Rate FY 1990 and request a recalculation of your default rate for the year 1990 based upon the following information.

(AR 10.) No mention was made of any exceptional mitigating circumstances and no objections were raised regarding the use of IBA's merged cohort default rate or the possibility that the Secretary failed to exclude certain loans due to improper servicing or collection.[9] This creates a preliminary issue

---

9. Pro Schools does not and cannot argue that it was not aware of the Secretary's reliance upon the merged cohort default rate at the time of its appeal. As stated earlier, the Secretary sent IBA

notices regarding the same in January, April and June of 1991, a time when Smith was apparently acting as IBA's Chief of Operations. (AR 4, 5 & 6.) The same must also have been apparent

as to whether these objections are properly before the Court.

The general rule is that "[a] reviewing court may not consider arguments that were not presented to the administrative agency whose determination is being appealed." *McEvers v. Sullivan*, 785 F.Supp. 1321, 1327 (C.D.Ill.1992), citing *McBride v. Sullivan*, 756 F.Supp. 361, 363 (N.D.Ill.1991); *see also, Alacare Home Health Services, Inc. v. Sullivan*, 891 F.2d 850, 855 n. 5 (11th Cir.1990) ("... an argument not raised in an administrative hearing cannot be raised on appeal"). The principle is rooted in both statutory and case law:

> We have recognized in more than a few decisions, and Congress has recognized in more than a few statutes, that orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts.... Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.

*United States v. Tucker Truck Lines*, 344 U.S. 33, 36–37, 73 S.Ct. 67, 68–69, 97 L.Ed. 54 (1952).

Pro Schools claims that its case falls within an exception to this general rule created for actions of administrative agencies that are (1) in excess of statutory authority; (2) likely to result in individual injustice; (3) disruptive of the legislative scheme; and (4) contrary to an important public policy extending beyond the rights of the individual litigants. *Board of Public Instruction of Taylor County, Fla. v. Finch*, 414 F.2d 1068, 1073 (5th Cir.1969).

from the "tape dump" which Pro Schools received from the guaranty agency for purposes of preparing its appeal. (Smith Aff. at ¶ 12.) This is the same "tape dump" which the Secretary uses to calculate the cohort default rate. *See generally, Atlanta College of Medical and Dental Careers, Inc. v. Riley*, 987 F.2d 821, 824 (D.C.Cir. 1993).

The same can be said for the claim that the Secretary may have failed to exclude certain

Pro Schools argues that the Secretary exceeded his statutory authority by applying a merged cohort default rate to Pro Schools, and further argues that there is individual injustice because the Secretary's decision denies an innocent party from participation in a federal program because of the actions of an unrelated third party. (Plaintiff's Brief at 21.) The Court disagrees. The Secretary has statutory authority to limit, suspend or terminate an institution's eligibility to participate in FFEL programs and also to issue regulations for that purpose. 20 U.S.C. § 1094(c)(1)(F). The Secretary also has statutory authority to "prescribe regulations designed to prevent an institution from evading the application to that institution of a default rate determination ... through the use of such measures as branching, consolidation, *change of ownership or control,* or any similar device." 20 U.S.C. § 1085(m)(3) (emphasis supplied). Moreover, the Court does not find any "individual injustice" in the application of a merged cohort default rate to a subsequent owner who (1) had full knowledge and notice of the default rate and its possible implications prior to purchase, and (2) designated each school as a mere "continuation" of the corresponding IBA school so as to avoid the otherwise applicable two-year waiting period for FFEL eligibility. Thus, Pro Schools' objections regarding the merged default rate, the failure to find exceptional mitigating circumstances and the possible failure to exclude loans due to improper servicing are not properly before the Court.

## B. The merits of each objection.

It is well-established that federal courts give considerable weight and deference to an administrative agency's construction of the statute it administers:

> loans due to improper servicing or collection. While Pro Schools seems to argue that it did not have this information at its disposal at the time of its appeal, a review of its pleadings makes it equally clear that it still has no such evidence and has made no attempt to obtain the same. (*See,* Section IV–B(4).) Thus, any claim made now could just as easily have been made during the administrative appeal.

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

"The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress".... If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation....

> Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

Furthermore, "[w]hen the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.... [T]he administrative interpretation ... becomes ... controlling ... unless it is plainly erroneous or inconsistent with the regulation." *Asociacion Colombiana de Exportadores de Flores v. United States,* 903 F.2d 1555, 1559–60 (Fed.Cir. 1990), quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

With these general principles in mind, the Court addresses the merits of each objection to the Secretary's decision.

### 1. The 45–day requirement.

This objection was already addressed in Section II, *infra.* As stated therein, the statutory requirement that the Secretary issue a decision on appeal within 45 days is only directory in nature and thus the failure to do so does not violate the governing statutes and regulations. For the same reasons, it does not render the Secretary's actions arbitrary and capricious.

### 2. The merged cohort default rate.

■ Pro Schools' objection to the application of a merged cohort default rate to its schools appears to be twofold: (1) there is no statutory or regulatory basis for calculating a "merged" cohort default rate applicable for the entire IBA chain; and (2) there is no statutory or regulatory basis for applying the merged rate to the institutions purchased by Pro Schools. (Plaintiff's Brief at 11–15.) The Secretary disputes these allegations and cites various statutes and regulations supporting his decision. As stated above, because Congress has not unambiguously addressed the issue, the Court must uphold the Secretary's interpretation of these statutes and regulations unless they are clearly erroneous or unreasonable.

As to the first objection, the Secretary claims his decision to "merge" the default rates of all the schools in the IBA chain was reasonable and consistent with 34 C.F.R. § 668.15(h)(1)(iii)(C), which reads in pertinent part:

> (C) For free-standing institutions that merge, the Secretary determines the cohort default rate based on the combined number of students who enter repayment during the applicable fiscal year and the combined number of students who default during the applicable fiscal years from both of the institutions that are merging. This cohort default rate applies to the new, consolidated institution.

The Secretary seems to argue that the IBA schools "merged", for purposes of this section, by certifying the vast majority of their loans under a single school ID number.

(Defendant's Reply Brief at 9–10.) Pro Schools argues that all of the IBA schools were free-standing institutions with their own ID numbers and that no formal merger ever took place. (Plaintiff's Brief at 12–13.) The latter argument assumes that the word "merge", as used in the regulation, can only refer to a formal merger in the commercial sense, such as when two independent corporations formally and legally merge into one corporate entity. This may be one reasonable interpretation of the regulation, but it is not the only one. Given that the word "free-standing" simply means that an institution has its own ID number, two or more free-standing institutions can reasonably be said to have "merged" when, for whatever reason, they all decide to use the same ID number. That is the essence of the Secretary's interpretation, and the Court does not think it clearly unreasonable or erroneous.

As to the second objection, the Secretary claims that his decision to apply IBA's merged default rate to Pro Schools is authorized by 20 U.S.C. § 1085(m)(3), which reads in pertinent part:

(3) **Regulations to prevent evasions**

The Secretary shall prescribe regulations designed to prevent an institution from evading the application to that institution of a default rate determination under this subsection through the use of such measures as branching, consolidation, change of ownership or control, or any similar device.

The Secretary argues that this is precisely what he attempted to do by terminating Pro Schools; he tried to prevent certain IBA schools from evading a default rate determination through a change of ownership. (Defendant's Reply Brief at 8–9.) Pro Schools counters that the statute was only intended to cover changes of ownership conducted in bad faith for the sole purpose of evading the application of an unfavorable default rate. (Plaintiff's Brief at 18.) Because there is no evidence that Pro Schools' purchased the seven schools for anything other than "legitimate business reasons", the Secretary should not have terminated their eligibility. (Id.)

Pro Schools' interpretation is not supported by the statutory language. In fact, it undermines the very purpose behind the SLDPIA. It encourages schools facing imminent termination to simply sell their assets to a good-faith buyer who, because of the way cohort default rates are calculated, would have a clean slate for five years before new default rates could be generated. The purpose behind the SLDPIA was to terminate schools with high default rates; it was not intended to find new management for such schools. The Secretary's interpretation of the statute is therefore reasonable and valid.

### 3. The 12 Tennessee and 7 "DR Defaulted Repayment" students.

■ Pro Schools argues that the Secretary wrongfully included 12 students who attended Tennessee schools when he computed the fiscal year 1990 default rate for IBA and Pro Schools. (Plaintiff's Brief at 19.) These students attended IBA schools in Tennessee which IBA sold in 1988 to a John and Sandra Roberts. (AR 10.) The Secretary responds that the Tennessee students were included because, regardless of where they attended school, their loans were certified under the same ID number used by all of IBA's schools. (AR 11.) And again, the same reasons that support the Secretary's decision to compute a "merged" default rate for all of the IBA schools support the Secretary's decision to include the Tennessee students. Both decisions are based upon the use of a single school ID number for the certification of hundreds of loans throughout the IBA chain. That is a reasonable basis for merging the default rates and also for including any loans certified by the same ID number.

Pro Schools also argues that the Secretary wrongfully included 7 loans in its cohort default rate which are currently listed in "DR Defaulted Repayment Status", which means that the borrowers initially defaulted but then started making payments again. (Amended Complaint at ¶ 30(c).) But as the Secretary points out, nothing in the regulations provides for the exclusion of such loans when calculating cohort default rates. (Defendant's Reply Brief at 20.) Under the regulations, the Secretary is to include every loan that enters repayment in one fiscal year

that defaults before the end of the subsequent fiscal year. 34 C.F.R. § 668.-15(h)(1)(i). These seven loans meet that definition. The only defaulted loans that are expressly excluded from the calculations are those which are rehabilitated under section 428F of the HEA, which is not the case with these loans. Thus, it was not arbitrary or capricious for the Secretary to include these loans in his calculations.

#### 4. The failure to exclude loans for improper servicing or collection.

■ As referenced earlier, Pro Schools suggests that the Secretary's "calculation of Pro Schools' default rate *may* also have included students that should not have been included because they entered repayment status in a different fiscal year", or that should have been excluded "due to improper servicing or collection." (Plaintiff's Brief at 20.) But this is only a suggestion. Pro Schools offers no evidence supporting such a claim.

In lieu of such evidence, Pro Schools relies upon *Atlanta College of Medical and Dental Careers, Inc. v. Riley*, 987 F.2d 821 (D.C.Cir. 1993) as support for its argument. (Plaintiff's Brief at 20.) *Atlanta College* stands for the proposition that the failure to exclude loans which are improperly serviced is a defense to a termination action, but the plaintiffs there had made the necessary factual record throughout the administrative and judicial proceedings. First, they obtained the necessary "tape dump' from the guaranty agencies, which is the same information relied upon by the Secretary when calculating the cohort default rates. (Pro Schools got this same information.) Then they appealed the Secretary's termination on the grounds of improper servicing or collection. (Pro Schools failed to do this.) One plaintiff commissioned a public accounting firm to perform an analysis of the tape dump for purposes of finding servicing errors and submitted that report as a basis for its appeal. (Pro Schools never did this.) The other tried to obtain information from the lenders regarding their collection activities, but was denied access. (Pro Schools never tried to do this.) After losing on appeal, plaintiffs took their factual record to the district court, which vacated the Secretary's decision. No such factual record exists here. At most, Pro Schools raises the possibility that servicing or collection errors might exist. That simply is not enough, especially given the evidence which the plaintiffs in *Atlanta College* were able to put forward.

#### 5. Failure to find exceptional mitigating circumstances.

■ Pro Schools does not specify the "exceptional mitigating circumstances" which make termination inequitable in this case, but the Court assumes it is a reference to the alleged unfairness of applying IBA's cohort default rate to Pro Schools. As mentioned earlier, the seven institutions which Pro Schools purchased, taken by themselves or as a group, apparently do not have default rates exceeding the threshold limits. (*See* pages 1318–1319 and footnote 5, *supra*.) But that does not render termination inequitable. Pro Schools, through its president, knew or should have known about the merged default rates and their possible implications at the time it purchased these seven schools. Pro Schools also elected to operate the schools as "continuation" schools, thereby avoiding a two year delay in eligibility for the FFEL program. Having assumed the benefit of IBA's eligibility for the FFEL program, the Court does not find it unfair or inequitable for the Secretary to require Pro Schools to assume liability for IBA's cohort default rates. Otherwise, as discussed earlier (*see* pages 1325–1326, *supra*), schools could avoid termination by simply changing ownership, which thwarts the very objectives of the SLDPIA.

#### 6. Failure to conduct independent review of evidence and provide reasonable explanation.

Lastly, Pro Schools alleges that the Secretary failed to conduct an independent review of the evidence submitted and failed to provide a reasonable explanation or standard for his decision. (Amended Complaint at ¶¶ 30(b) & (e).) These claims are patently without merit. The only objections Pro Schools raised on appeal were those concerning the inclusion of the 12 Tennessee students and the 7 "DR Defaulted Repayment"

students. (AR 10.) The Secretary clearly considered those objections and provided a substantial and reasonable explanation for why those loans were included in his calculations. (AR 11; *see also* page 1326, *supra.*) No other objections or evidence were submitted and no further explanations were necessary.

NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

1. Plaintiff's motion for summary declaratory judgment is denied; and

2. Defendants' motion for summary judgment is granted and plaintiff's claims are dismissed with prejudice.

SO ORDERED.